Harry HENTZNER, Appellant,

v.

STATE of Alaska, Appellee.

No. 3649.

Supreme Court of Alaska.

June 20, 1980.

Deborah Paquette, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

Timothy Petumenos, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

Hentzner was convicted of two counts of offering and two counts of selling unregistered and non-exempt securities in violation of AS 45.55.070.[1] He was sentenced to four concurrent sentences of five years in the penitentiary with four years suspended on the condition that he notify purchasers of his conviction and make restitution. On appeal, he contends that what he offered for sale and sold were not securities; that the trial court gave erroneous jury instructions on the definition of security and on the state of mind required for a conviction; and that mistakes concerning the admission and exclusion of evidence were made.

## I

We turn first to a statement of the facts necessary for understanding this case. During the summer of 1968, Hentzner staked thirteen mining claims in an area northeast of Delta Junction. In 1974, he raised some $36,000 from investors in his native state of Wisconsin, with which he acquired mining equipment and began to mine. In February of 1975, in an effort to raise more money for mining, Hentzner placed advertisements in newspapers in Fairbanks and in Delta Junction. In them he offered to sell no more than 2,000 ounces of gold at the considerably below market price of $80 per ounce. Delivery was to be within six to eight months. The advertisement explained that the money would be used to finance mining to begin in the spring.[2]

---

1. AS 45.55.070 provides:

    *Registration requirement.* It is unlawful for a person to offer or sell a security in this state unless (1) it is registered under this chapter or (2) the security or transaction is exempted under § 140 of this chapter.

2. The full text of the advertisement placed in the Delta Junction newspaper is as follows:

    ORDER NOW        ORDER NOW

    GOLD SALE
    $80 OUNCE
    Only 2,000 ounces at this price
    FOUR DAYS ONLY

    A chance to double and even triple your money within the next six to eight months. Many financial men predict that gold could reach $300 by the end of this year.
    WHY AM I SELLING GOLD FOR ONLY $80 AN OUNCE?
    I need your HELP to buy mining equipment, fuel, supplies, payrol, etc. to start mining this spring. You HELP me out, and I am willing to let the first 2,000 ounces of GOLD go on sale for $80 an ounce.
    Over $45,000 was spent last summer on the Pilot Testing of the ores, and the chances of succeeding are 99%, and only 1% chance of failure. Our mines are located in Black Mountain, Tibbs Creek, Goodpaster area, about 110 air miles Southeast of Fairbanks and 50 air miles Northeast of Delta Junction, Alaska.
    Arrangements have been made for delivery from the Refinery, directly to the Banks in this area, for disbursement of your gold orders. Please allow six to eight months for delivery.

    | 400 ounce Ingot | | $32,000 |
    |---|---|---|
    | 100 " " | | 8,000 |
    | 50 " " | | 4,000 |
    | 5 " Bar | | 400 |
    | 1 " " | | 80 |
    | 1/2 " Wafer | | 40 |
    | 1/4 " " | | 20 |

Several people responded to the ads and ordered gold from Hentzner. In April of 1975, while on one of his mining claims, Hentzner was served with what he has described as an injunction to stop mining by an Alaska State Trooper.[3] Evidently Hentzner obeyed what he regarded as the command of the state not to mine. He has not delivered gold to the investors.

## II

At the close of the state's case, Hentzner moved for judgment of acquittal on the ground that the subject matter of his transactions was not a security as a matter of law. The motion was denied.

■ In considering a motion for a judgment of acquittal, both at trial and on appeal, the court "must take the view of the evidence and the inferences therefrom most favorable to the state. If . . . fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt," the motion must be denied. *Gray v. State*, 463 P.2d 897, 905 (Alaska 1970). *See, e. g., Gipson v. State*, 609 P.2d 1038 (Alaska 1980), *Martin v. State*, 456 P.2d 462, 464–65 (Alaska 1969).

■ When Hentzner performed the acts complained of the term "security" was defined as follows:

AS. 45.55.130. (12) "security" means a note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-

trust certificates; preorganization certificate or subscription; transferable share; *investment contract*; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease or in any sale of or indenture or bond or contract for the conveyance of land or any interest in land; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing; "security" does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed sum of money either in a lump sum or periodically for life or for some other specified period;[4] [Emphasis added].

The state contends that what Hentzner offered and sold was an investment contract as that term is used in the foregoing definition, and thus a security. In *Securities and Exchange Com'n v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), "investment contract" was defined as

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . .

*Id.* 328 U.S. 299–300, 66 S.Ct. 1100–1103, 90 L.Ed. 1249. The United States Supreme Court has recently stated that this definition

---

All gold will be certified as to value and fineness of 99.5% or better.
  Sale starts Friday February 28, 1975
  EVERGREEN INN—DINING ROOM
  From 10:00 A.M. until 7:00 P.M. Daily
Many people will consider this a gamble, but I am gambling on my name and reputation, and that the people in this area will give me their HELP. I have spent thousands of dollars in Delta Junction, and I expect to spend hundreds of thousands of dollars in the future. Any HELP will be greatly appreciated, and should be profitable to you for any gold purchased. No order too small, nor too large, up to 2,000 ounces. Based on First Come, First Served.

Thank you,
Harry J. Hentzner
Black Sands Mining Company
P.O. Box 606
Delta Jct., Alaska 99737

**3.** The documents which were served on Hentzner are not in the record.

**4.** This definition is nearly the same as the definition of security found in Section 401(*1*) of the Uniform Securities Act, 7A ULA 628 (1978), and in section 2(1) of the Securities Act of 1933, as amended, 15 U.S.C. § 77b(1).

embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

*United Housing Foundation, Inc. v. Foreman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621, 632 (1975).

Hentzner contends that the transactions at issue do not contain either the common enterprise or the profit from the efforts of others elements set forth in the *Howey* definition. We believe that both are readily present.

The common enterprise requirement has come to mean only that the investor's financial interests must be "inextricably interwoven" with those of the promoter or third parties. *Securities and Exchange Com'n v. Commodity Options International, Inc.,* 553 F.2d 628, 633 (9th Cir. 1977); *Securities and Exchange Com'n v. Glen W. Turner Ent.,* 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); Hannon and Thomas, *The Importance of Economic Reality and Risk in Defining Federal Securities,* 25 Hastings L.J. 219, 236 (1973–74). That was the situation in this case. The advertisements made it clear that the money received from investors was to be pooled in order to buy mining equipment and supplies so that Hentzner could mine the gold he was contracting to sell. While Hentzner's obligation to deliver gold was not legally conditional upon his mining success, the plain implication of the ads was that a mining failure would result in nondelivery of the gold.[5]

Essentially the same thing can be said of the requirement that the expected profits come from the efforts of others. One who buys gold for investment purposes does so with the hope that its price will increase

and that it can be sold at a profit. That expectation does not depend on the managerial efforts of the seller of gold, and such a transaction is therefore not ordinarily regarded as an investment contract. *See, e. g., Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359, 366–67 (S.D.N.Y.1966). However, add to the buyer-seller relationship a continuing dependency by the buyer on the seller's expertise and ability in managing the investment and the efforts of others test is met. The contract will then be regarded as a security, assuming the other parts of the *Howey* definition are satisfied. *See, e. g., Commodity Options International, Inc.,* 553 F.2d at 633; *Glen W. Turner, Ent., Inc.,* 474 F.2d at 482 (the test is satisfied if the "efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"); *McClellan v. Sundholm,* 89 Wash.2d 527, 574 P.2d 371, 374 (1978). Since the investors were in a position of continuing dependency on Hentzner's efforts to extract gold from the ground, the efforts of others test was satisfied.

The form, as well as the substance, of Hentzner's plan was that investors would pay money to him so that he could mine gold, and if he did so successfully the investors would profit. The contracts he made fall squarely within the definition of an investment contract and are therefore securities. No error was committed in denying Hentzner's motion for judgment of acquittal.

### III

AS 45.55.210(a) provides that upon a wilful violation of the Securities Act, including the registration requirement of AS 45.55.-070,[6] one may be convicted of a felony punishable by a fine of not more than

---

5. Thus the ad placed in the Delta Junction newspaper refers to a "1% chance of failure" and states, "many people will consider this a gamble, but I am gambling on my name and

reputation, and that the people in this area will give me their HELP."

6. *See* note 1.

$5,000 or imprisonment for not less than one year nor more than five years, or both.[7]

As to each count of the indictment, the jury was instructed that in order to convict Hentzner it had to find that he acted wilfully, unlawfully, feloniously, and with specific intent to violate the law.[8] In response to questions from the jury expressing uncertainty over what state of mind was required, the trial judge stated that the term "feloniously" should be disregarded and that Hentzner did "not have to intentionally violate the law; he [did] have to intentionally do the acts which are prohibited by law."

Hentzner argues that the state had to prove knowledge of wrongdoing in this case and that the instructions, especially as amended by the court following the jury's questions, were inadequate to convey this point.

The state contends that the only state of mind required was an intention to offer and sell and the fact that Hentzner might not have known that those acts were unlawful or that his conduct was in any sense wrongful is not relevant. Thus, the state contends that the trial court's instructions were correct.

The issue before us is the meaning of the word "wilfully" as used in AS 45.55.210(a).

There are several possibilities. One is that the defendant must act intentionally in the sense that he is aware of what he is doing; another is that the defendant must be aware that what he is doing is illegal; and a third is that the defendant must know that what he is doing is wrong.[9] It is in this last sense that we think "wilfully" should be interpreted as it is used in Section 210.

We recognized in *Speidel v. State*, 460 P.2d 77, 78 (Alaska 1969) that criminal intent is an essential predicate of criminal liability. "It is said to be a universal rule that an injury can amount to a crime only when inflicted by intention—that conduct cannot be criminal unless it is shown that one charged with criminal conduct had an awareness or consciousness of some wrongdoing." [Footnote omitted]. We noted as well that the "general conditions of penal liability" require

[N]ot only the doing of some act by the person to be held liable, but also the existence of a guilty mind during the commission of the act.

Although an act may have been objectively wrongful, the mind and will of the doer of the act may have been innocent. In such a case the person cannot be punished for a crime, unless it is one such as

7. AS 45.55.210(a) provides:
   Criminal penalties. (a) *A person who wilfully violates a provision of this chapter* except § 160 of this chapter, or who wilfully violates a rule or order under this chapter, or who wilfully violates § 160 of this chapter knowing the statement made to be false or misleading in a material respect or the omission to be misleading by any material respect, upon conviction, is punishable by a fine of not more than $5,000, or by imprisonment for not less than one year nor more than five years, or both. Upon conviction of an individual for a felony under this chapter, imprisonment for not less than one year is mandatory. However, no individual may be imprisoned for the violation of a rule or order if he proves that he had no knowledge of the rule or order. No indictment or information may be returned under this chapter more than five years after the alleged violation. [Emphasis added].

8. The jury instructions provided in relevant part:

As used in these instructions, the word "unlawfully" means contrary to law.

"Willfully" is defined as an act done intentionally and purposely and with specific intent to do that which the law forbids.

"Feloniously" means with criminal intent and evil purpose.

The crimes charged in this case require proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the acts. To establish specific intent the State must prove that the defendant willfully offered to sell unregistered and non-exempt securities and willfully sold unregistered and non-exempt securities. Such intent may be determined from all the facts and circumstances surrounding the case.

9. *See* James, *Culpability Predicates For Federal Securities Laws Sanctions: The Present Law And The Proposed Federal Securities Code*, 12 Harv.J. on Legislation 1, 5–6 (1974–5).

the 'public welfare' type of offense, which we have discussed, where the penalties are relatively small and the conviction does no great damage to an offender's reputation.

*Id.* at 80.

We followed *Speidel* most recently in *State v. Guest*, 583 P.2d 836 (Alaska 1978). The issue in *Guest* was whether in a prosecution for statutory rape a reasonable belief by the defendant that the victim was of, or older than, the age of consent was a defense. We answered that question in the affirmative stating that "[t]o refuse such a defense would be to impose criminal liability without any criminal mental element." *Id.* at 839.

█ Where the crime involved may be said to be *malum in se*, that is, one which reasoning members of society regard as condemnable, awareness of the commission of the act necessarily carries with it an awareness of wrongdoing. In such a case the requirement of criminal intent is met upon proof of conscious action, and it would be entirely acceptable to define the word "wilfully" to mean no more than a consciousness of the conduct in question. *See Alex v. State*, 484 P.2d 677, 680–82 (Alaska 1971). However, where the conduct charged is *malum prohibitum* there is no broad societal concurrence that it is inherently bad. Consciousness on the part of the actor that he is doing the act does not carry with it an implication that he is aware that what he is doing is wrong. In such cases, more than mere conscious action is needed

to satisfy the criminal intent requirement.[10] The criminal conduct charged in *Speidel*, failure to return a rented car at the time stated in the agreement, fell within this category. We held that proof of a conscious purpose to injure the owner of the vehicle was required to sustain a conviction. 460 P.2d at 80–82.

The crime of offering to sell or selling unregistered securities is *malum prohibitum*, not *malum in se*.[11] Thus, criminal intent in the sense of consciousness of wrongdoing should be regarded as a separate element of the offense, unless the public welfare offense exception referred to in *Speidel* applies.

█ The public welfare offense exception encompasses a narrow class of regulations "caused primarily by the industrial revolution, out of which grew the necessity of imposing more stringent duties on those connected with particular industries, trades, properties, or activities that affect public health, safety or welfare." *Speidel*, 460 P.2d at 78 (citation omitted). The penalties imposed for public welfare offenses " 'commonly are relatively small, and conviction does no grave damage to an offender's reputation.' " *Id.* at 79, *quoting Morissette v. United States*, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288, 297 (1952).

█ We do not think that the offenses of which Hentzner was convicted fall within the public welfare offense exception, because the penalty for violating them is not small. Hentzner could have been sentenced

---

10. *See, e. g., People v. Ferguson*, 134 Cal.App. 41, 52–53, 24 P.2d 965, 970 (1933) where the court stated in a securities prosecution:

> It is true generally that where the act is knowingly and willfully done the act imports the intent. *People v. O'Brien*, . . . 31 P. 45, which case we had recent occasion to consider; see *People v. A. L. Ferguson*, 18 P.2d 741.
>
> However, it occurs to us that a different situation is here presented. The regulation which has not been complied with is malum prohibitum and not malum in se. It covers one of the most complicated phases of modern commercial life. The statute can be read strictly or liberally, according to the type of mind applied to it. . . .

> The case of changing a public record, as in the *O'Brien* Case or of the possession of metal knuckles as in the *A. L. Ferguson* Case, were instances of knowingly doing that which the law prohibits. In such instances the act imputes the intent. In the instant circumstance the act does not impute intent. *Id.* at 970.

11. *See, e. g., State v. Burrow*, 13 Ariz.App. 130, 474 P.2d 849, 851 (1970); *State v. Russell*, 119 N.J.Super. 344, 291 A.2d 583, 586 (1972); 2 L. Loss, *Securities Regulation* Ch. 8(B), at 1309 (1961).

to a maximum term of imprisonment of twenty years; he has been sentenced to a one year prison term which, should he violate a condition of probation, might easily be extended to five years. Such a sentence must carry with it considerable societal opprobrium. "[T]he infamy is that of a felony, which, says Maitland, is '. . . as bad a word as you can give to a man or a thing.'" *Morissette*, 342 U.S. at 260, 72 S.Ct. at 248, 96 L.Ed. at 299. (Footnote omitted).

The criminal intent requirement of *Speidel* and *Guest* is based on the constitutional requirement of due process. We construed the statute involved in *Guest* to include criminal intent as an element of the offense proscribed in order to avoid finding the statute unconstitutional. *Guest*, 583 P.2d at 839. We construe "wilfully" as it is used in AS 45.55.210(a) to require an awareness of wrongdoing for the same reason.[12]

There is substantial authority holding that in securities crimes prosecuted under statutes similar in structure to AS 45.55.210(a), "wilful" requires awareness of wrongdoing as an essential element of the offense. In *United States v. Peltz*, 433 F.2d 48 (2nd Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971), Judge Friendly, writing for the court, addressed the question of what mental state the government must prove in order to establish criminal liability under Section 32(a) of the Securities Exchange Act. Referring to an article by Judge Herlands, *Criminal Law Aspects of the Securities Exchange Act of 1934*, 21 Va.L.Rev. 139 (1934), he stated:

> The Herlands article concluded it was necessary only that "the prosecution establishes a realization on the defendant's part that he was doing a wrongful act," 21 Va.L.Rev. at 149. We accept this with the qualifications, doubtless intended by the author, that the act be wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred.

433 F.2d at 55 (citations omitted). The *Peltz* formulation has been followed in *United States v. Chiarella*, 588 F.2d 1358, 1370–71 (2nd Cir. 1978), *cert. denied*, 441 U.S. 942, 99 S.Ct. 2158, 60 L.Ed.2d 1043 (1979); *United States v. Charnay*, 537 F.2d 341, 352 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976);[13] *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976); *State v. Cox*, 17 Wash.App. 896, 566 P.2d 935, 940 (1977), *cert. denied*, 439 U.S. 823, 99 S.Ct. 90, 58 L.Ed.2d 115 (1978).

Other authorities requiring an awareness of wrongdoing as the mental state applicable in securities law prosecutions include *United States v. Crosby*, 294 F.2d 928, 948 (2nd Cir. 1961); and *Van Antwerp v. State*, 358 So.2d 782, 786 (Ala.Cr.App.1978). In

12. In the past half century the United States Supreme Court has several times construed "wilfully" as used in criminal statutes to include at least an awareness of wrongdoing. Thus, in *United States v. Murdoch*, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) the Court concluded that use of the word "wilfully" in a criminal statute prohibiting the wilful failure to supply information relating to income tax returns meant that evil intent was a constituent element of the crime. *Murdoch* was reaffirmed in *Spies v. United States*, 317 U.S. 492, 498, 63 S.Ct. 364, 368, 87 L.Ed. 418, 422 (1943) ("we would expect wilfulness in such a case to include some element of evil motive . . . ."). In *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the plurality opinion of the Court stated concerning the meaning of "wilfully:"

> But 'when used in a criminal statute it generally means an act done with a bad purpose.

> . . . In that event something more is required than the doing of the act proscribed by the statute. . . . An evil motive to accomplish that which the statute condemns becomes a constituent element of the crime.

325 U.S. at 101, 65 S.Ct. at 1035, 89 L.Ed. at 1502. (Citations omitted).

13. In *Charnay* the court stated on rehearing:

> Although we did state that the cases have held that there is no requirement of proof that a defendant knew he was violating a particular S.E.C. rule, we did not hold that scienter *per se* was not a required element of the offense. Rather we noted that it was necessary for the prosecution to show an intentional act with "a realization on the defendant's part that he was doing a wrongful act."

537 F.2d at 358.

*United States v. Dardi*, 330 F.2d 316, 331 (2nd Cir.), *cert. denied*, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), the trial court charge that an act was wilful if "done knowingly, deliberately and with evil motive or purpose" was approved. In *Tarvestad v. United States*, 418 F.2d 1043, 1047 (8th Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970), the trial court instructed the jury that an act is done wilfully "if it is done knowingly and deliberately with bad purpose," and charged that good faith was a complete defense. The court of appeals did not rule that these instructions were required, being content to conclude that they satisfied any requirement for evil motive which the law imposed. A similar charge received a similar response by the Fifth Circuit in *Roe v. United States*, 316 F.2d 617, 621 n. 9 (5th Cir. 1963).

There is contrary authority which supports the state's position, *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 680–82 (4th Cir.), *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119, *reh. denied*, 389 U.S. 998, 88 S.Ct. 458, 19 L.Ed.2d 503 (1967); *United States v. Sussman*, 37 F.Supp. 294, 296–97 (E.D.Pa.1941); *State v. Burrow*, 13 Ariz.App. 130, 474 P.2d 849 (1970); *People v. Clem*, 39 Cal.App.3d 539, 114 Cal.Rptr. 359 (1974); *State v. Hodge*, 204 Kan. 98, 460 P.2d 596, 604 (1969); *State v. Russell*, 119 N.J.Super. 344, 291 A.2d 583, 587 (1972),[14] but we do not find it persuasive.

In *Sussman*, a trial judge, with no discussion or citation of authority upheld the validity of his own instruction to the jury on the meaning of wilfully. In *Custer*, awareness of wrongdoing was not actually in issue since the case was a criminal contempt proceeding resulting from violation of a court order of which defendants had knowledge. The state cases are notable in at least two other respects both of which make them inapplicable to this case.

First, *Clem, Hodge* and *Russell*, strongly rely on the Commissioner's Note pertaining to the meaning of "wilfully" used in section 204(a)(2)(B) of the Uniform Securities Act which states:

> As the federal courts and the SEC have construed the term "willfully" in section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o (b), all that is required is proof that the person acted intentionally in the sense that he was aware of what he was going. Proof of evil motive or intent to violate the law, or knowledge that the law was being violated, is not required. The principal function of the word "willfully" is thus to serve as a legislative hint of self restraint to the Administrator.

7A ULA 591 (1978). The section of the Uniform Securities Act commented on solely involves administrative sanctions, as does the federal law section to which the comment refers. A Commissioner's Note appended to the criminal penalty section of the Uniform Act, Section 409(a), does refer the reader to the note following 204(a)(2)(B). 7A ULA 665 (1978). However, at least two commentators, including Professor Loss who was the draftsman of the Uniform Act, *id.* at 562, have expressed substantial doubt as to whether the meaning of "wilfully" for administrative enforcement purposes is the same as for purposes of criminal liability. 2 L. Loss, *Securities Regulation* ch. 8(B), at 1309 (1961); James, note 7 *supra* at 3, 14, 61. Moreover, the United Securities Act was approved by the Commissioners in 1956. 7A ULA 561. The Commissioner's Note thus antedates almost all of the cases construing the word "wilfully" in the context of criminal prosecutions under the federal securities acts and, understandably, does not accurately summarize what those cases hold.

Our second observation is that *Burrow* and *Russell* acknowledge that the absence

---

**14.** The State would add to this list, a recent Colorado decision, *People v. Blair*, 579 P.2d 1133 (Colo.1978). The state's reading of this case is, however, debatable because the court affirmed the conviction only after satisfying itself that the "thrust" of the instructions "was that, in order for the jury to convict the defendant, it must find that he actually knew that the statements were misleading." *Id.* at 1138.

of a requirement of awareness of wrongdoing makes the crime of selling unregistered securities one of strict liability. *Burrow,* 474 P.2d at 851; *Russell,* 291 A.2d at 587. This court has consistently stated that strict criminal liability may not constitutionally be imposed for serious crimes, *Guest,* 583 P.2d at 839; *Kimoktoak v. State,* 584 P.2d 25, 29 (Alaska 1978); *Alex,* 484 P.2d at 681; *Speidel,* 460 P.2d at 80. We believe, therefore, that these authorities cannot be reconciled with our prior decisions.

### IV

Another claim of error is that expert testimony that Hentzner's contracts were securities should not have been admitted. The state has confessed error on this point and contends only that the error was harmless. In view of our disposition of this case, the issue need not be addressed.

■ Hentzner also contends that his cross-examination of two investor witnesses was unduly restricted by the trial court. He argues that he was barred from asking the investors what they thought they were buying. The only objection which was sustained on this point was made during the testimony of the witness Largin. Hentzner's counsel then made an offer of proof that Largin would testify that all she was buying was gold, not an interest in Hentzner's mine. Subsequently, Largin so testified before the jury. Thus, there is no basis for this claim of error.

Hentzner also claims that the instructions to the jury pertaining to the definition of an investment contract were erroneous. Specifically he claims that the court's instructions did not include the elements of common enterprise and dependency on the efforts of others. The state in response, does not defend the instructions on the merits. Instead, it contends that Hentzner did not properly object to them at trial and that they were adequate under the facts of this case because the omitted elements were present as a matter of law. Since Hentzner's conviction must be reversed on other grounds we need do no more than express our view that in the event of a re-trial the jury should be given an instruction which sets forth the constituent elements of an investment contract. *United States v. Carman,* 577 F.2d 556, 563 (9th Cir. 1978); *United States v. Austin,* 462 F.2d 724, 736–37 (10th Cir.) *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972); *Roe v. United States,* 287 F.2d 435, 440–41 (5th Cir.), *cert. denied,* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961).

REVERSED AND REMANDED.