Dean C. KINNEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5812.

Court of Appeals of Alaska.

Nov. 29, 1996.

Scott Jay Sidell, Anchorage, for Appellant.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Dean C. Kinney was convicted of arranging a sale of liquor in a local-option community—a community where, by local vote, the sale of liquor was banned. AS 4.16.200(b). Kinney argues that his conviction is invalid because the jury never determined whether Kinney knew that he was breaking the law when he arranged the sale of the liquor. We hold that the State was not required to prove that Kinney knew he was breaking the law.

Kinney also argues he was entitled to an acquittal because he obtained no monetary profit from the sale of the liquor. The legislature has enacted a "no personal profit" defense for people charged with distributing liquor without a license, but this defense is not available to people charged with distributing liquor in local-option communities. Kinney argues that the legislature violated the due process clause of the Alaska Constitution when it made the "no personal profit" defense inapplicable to sales in local-option communities. We hold that the legislature

had a rational basis for drawing this distinction.

*Facts of the Case*

During January and February of 1994, the state troopers conducted an investigation of bootlegging in Bethel. One of their undercover informants was Rick Wilson. Wilson had arranged to purchase liquor from A.A., a suspected bootlegger, on February 1st, but when Wilson arrived for the transaction, A.A. demurred. Instead, A.A. offered to introduce Wilson to another bootlegger. He then took Wilson to the Hammer Manor Apartments, where he introduced him to the manager, Dean Kinney. Kinney offered to sell liquor to Wilson, but Wilson declined.[1]

The next day, Wilson returned to the Hammer Manor Apartments and attempted to purchase alcohol from Kinney. This time, Kinney told Wilson that he would have to make a telephone call first. Kinney made the call and, soon thereafter, someone knocked at Kinney's door. Kinney went out to speak to the person at his door; when Kinney came back in, he was carrying a bottle of vodka. Kinney gave the bottle to Wilson, and Wilson gave Kinney $50.00 in pre-recorded buy money. Upon leaving Kinney's apartment, Wilson took the bottle to his trooper supervisor and reported this transaction. Based on this sale, the troopers obtained a warrant to record ensuing transactions between Wilson and Kinney.

On February 4th, Wilson returned to Kinney's apartment and asked if he could buy another bottle of liquor. This second transaction occurred in much the same way as the first: Kinney made a telephone call, a bottle was delivered outside Kinney's apartment, and Kinney sold the bottle to Wilson for $50.00. During the negotiation of this sale, Wilson asked Kinney if he could "give [him] a break on the price". Kinney replied that he was only making a profit of $5.00 on each sale and he therefore could not lower the price.

On February 18th, Wilson made a third purchase from Kinney. Wilson went to Kin-

---

1. Wilson was wearing electronic monitoring equipment, and he was afraid that, if he monitored Kinney, this would violate the terms of the warrant authorizing the monitoring; the warrant mentioned only Wilson's anticipated conversations with A.A.

ney's apartment and told Kinney that he wanted to make a purchase. This time, Kinney asked Wilson how many bottles he wished to purchase; Wilson replied that he wanted just one. Again, Wilson offered Kinney $50.00, but this time Kinney told Wilson to return one hour later. Both men left Kinney's apartment. Approximately one hour later, Kinney returned to the apartment, and Wilson arrived soon thereafter. Kinney had a bottle of liquor for Wilson upon his return. During this third transaction, Wilson again asked Kinney to give him a break on the price, but Kinney again refused, adding that he "wasn't making anything".

Kinney was ultimately indicted on three counts of felony bootlegging under AS 4.11.010(a) and AS 4.16.200(b). Following a jury trial in the Bethel superior court, Kinney was convicted for the second and third sales (the ones that had been recorded).

*In a prosecution for bootlegging, must the government prove that the defendant knew his conduct was illegal?*

■ At trial, Kinney asked the judge to instruct the jury that Kinney could not be convicted unless the government proved that he was "aware that his conduct was of an illegal nature". The trial judge declined to give this instruction. On appeal, Kinney argues that his proposed instruction was constitutionally required.

Kinney's argument hinges on language taken from *Hentzner v. State*, 613 P.2d 821 (Alaska 1980), a case in which the supreme court interpreted the culpable mental state required for the crime of selling unregistered securities. Hentzner was prosecuted under AS 45.55.210(a) [now AS 45.55.925(a) ], which provides criminal penalties for anyone who "wilfully" violates the Securities Act. The supreme court had to decide what "wilfully" meant. *Hentzner*, 613 P.2d at 825.

To interpret this statute, the supreme court relied on the principle that a person may not be convicted of a crime (with the exception of minor violations and public welfare offenses) unless the government proves that the defendant acted with "criminal intent", in the broad sense of "a culpable mental state". *See Speidel v. State*, 460 P.2d 77, 78 (Alaska 1969); AS 11.81.600(a).[2] Referring to this basic requirement of criminal intent, the court said:

Where the crime involved may be said to be *malum in se*, that is, one which reasoning members of society regard as condemnable, awareness of the commission of the act necessarily carries with it an awareness of wrongdoing. In such a case[,] the requirement of criminal intent is met upon proof of conscious action, and it would be entirely acceptable to define the word "wilfully" to mean no more than consciousness of the conduct in question. *See Alex v. State*, 484 P.2d 677, 680–82 (Alaska 1971) [holding that, in a prosecution for escape, the government need not show that the defendant knew that he was breaking the law]. However, where the conduct charged is *malum prohibitum* [,] there is no broad societal concurrence that it is inherently bad. Consciousness on the part of the actor that he is doing the act does not carry with it an implication that he is aware that what he is doing is wrong. In such cases, more than mere conscious action is required to satisfy the criminal intent requirement. . . .

The crime of offering to sell or selling unregistered securities is *malum prohibitum*, not *malum in se*. Thus, criminal intent in the sense of consciousness of wrongdoing should be regarded as a separate element of the offense[.]

*Hentzner*, 613 P.2d at 826.

Kinney contends that the crime of bootlegging, like the crime of selling unregistered securities, is *malum prohibitum*. He therefore argues that, like the defendant in *Hentzner*, he too could not be convicted unless the

---

**2.** AS 11.81.600, which is entitled, "General Requirements of Culpability" provides:

(a) The minimal requirement for criminal culpability is the performance [of] . . . a voluntary act or the omission to perform an act that the person is capable of performing.

(b) [With the limited exceptions listed below,] [a] person is not guilty of an offense unless the person acts with a culpable mental state[.]

State proved that he acted with "consciousness of wrongdoing". According to Kinney, this means proving that he understood that his conduct violated the law.

The distinction between crimes that are "mala prohibita" and those that are "mala in se" has not only shaped but, to a certain extent, also bedeviled the law. Basically, a crime is termed "malum prohibitum" if it is "not inherently evil [but is] wrong only because prohibited by the legislature". A crime is "malum in se" if it is "wrong in [itself], inherently evil". Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 1.6(b), Vol. 1, p. 45.

However, as LaFave and Scott point out, this terminology has never been precise. *Id.* at 45–48. Generally, common-law crimes are called "mala in se" and statutory crimes are called "mala prohibita", but courts also say that a crime is "malum in se" if it involves "moral turpitude". These criteria sometimes point in different directions. For instance, the offenses of embezzlement and obtaining money by false pretenses are statutory expansions of the common-law crime of larceny, *see LaFave and Scott*, § 8.6(a) and § 8.7(a), Vol. 2, pp. 368 and 383, yet few would dispute their classification as crimes of moral turpitude.

A third criterion is stated in Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 896: If a statute proscribes conduct that is "intolerably below the level of proper moral behavior", then the offense is *malum in se*. If, on the other hand, the defined conduct is not "morally culpable" (*Perkins* gives the example of overtime parking), then the offense is *malum prohibitum*.

The *Hentzner* decision itself suggests yet a fourth criterion. In the above-quoted passage, the supreme court refers to *mala in se* crimes as those offenses "which reasoning members of society regard as condemnable", while *mala prohibita* crimes are those proscribing conduct as to which "there is no broad societal concurrence that it is inherently bad". *Hentzner*, 613 P.2d at 826.

Given criteria like these, there is little wonder that courts reach differing answers when asked to classify the same offense. For instance, the crimes of driving while intoxicated and possession of drugs have been classified by some courts as *mala in se,* while other courts have found them to be *mala prohibita*. *LaFave & Scott*, § 1.6(b), Vol. 1, p. 46. LaFave and Scott conclude that "[t]he difficulty of classifying particular crimes as *mala in se* or *mala prohibita* suggests … that the classification should be abandoned[.]" *Id.* at 48.

As an intermediate appellate court, we are loath to abandon a classification that our supreme court has expressly relied on. Rather, our task should be to interpret how that classification applies to the case before us.

*Hentzner* declares that a crime is *malum prohibitum* if "there is no broad societal concurrence that [the proscribed conduct] is inherently bad". One could argue that even though unlicensed sale of liquor is normally *malum prohibitum*, sale in a local-option community is *malum in se*. If a person sells liquor in a community where sale is legal but restricted to certain license-holders, then the crime is simply a violation of laws regulating commercial transactions. But if a community has seen the need to prohibit all sales of alcohol, then there may be "broad societal concurrence" that the act of selling alcohol is condemnable.

Despite this potential argument, we will assume for purposes of deciding Kinney's appeal that all laws prohibiting the sale or distribution of alcohol create *mala prohibita* crimes. Nevertheless, we reject Kinney's assertion that, under *Hentzner,* the State had to prove that Kinney understood the law and knew that he was breaking it.

As noted above, *Hentzner* involved a prosecution for the crime of offering securities that had not been registered with the Department of Commerce and Economic Development. The defendant, who was attempting to raise money for a gold-mining venture, offered to sell his to-be-mined gold for the price of $80.00 an ounce (substantially below market value) to anyone who would pay the purchase price immediately. That is, Hentzner was asking people to give him money in exchange for his promise that, in several

months, they would be repaid in gold at the extremely favorable rate of one ounce for every $80.00 they advanced him. *Hentzner,* 613 P.2d at 822.

The State alleged that Hentzner's fund-raising effort constituted the offering of a "security" (more specifically, an "investment contract") under AS 45.55.130(12) [now, AS 45.55.990(12) ]. The State's theory was that, by offering to sell gold that had not yet been mined, Hentzner was in effect asking people to invest money upon the promise that they would share in future gold-mining profits to be derived from Hentzner's entrepreneurial or managerial efforts. *Hentzner,* 613 P.2d at 823–24.

■ *Hentzner* represented a collision between the practice of "grubstaking" [3], a traditional way for western miners to raise capital, and Alaska's securities act—in particular, the labyrinth of definitions and exemptions codified in AS 45.55.900 and AS 45.55.980–990. Under Alaska's securities laws, the request for a grubstake is the offer of a "security", and a miner who wishes to ask for a grubstake must register this offering.

The definition of a security and the rules governing registration are not matters of common knowledge. Thus, the supreme court faced a situation in which a miner who pursued a traditional capital-raising practice, who engaged in no misrepresentation, and who (at least arguably) acted reasonably in failing to discover the need to register his fund-raising effort, could nevertheless face felony conviction for his failure to register the grubstake offer with the Department of Commerce and Economic Development. Given this context, it is hardly surprising that the supreme court ruled that "wilfully" failing to register the grubstake offer required proof of something more than mere failure to register.

Kinney interprets *Hentzner* as saying that this "something more" must be proof that the defendant understood that his conduct violated the law. This is how the State of Alaska interpreted *Hentzner* when it filed its peti-

tion for rehearing. In its petition, the State argued that the supreme court was "breaking new ground in requiring the [government] to prove [the defendant's] knowledge of the law". [Petition for Rehearing in *Hentzner v. State,* File No. 3649, p. 2] The State asked the court to amend its opinion to clarify that "the prosecution, to prove Hentzner guilty, must prove that he acted with intent to do wrong, but that this ... does not include knowledge of the penal law". [Petition, p. 3]

In a tersely worded order, the supreme court rejected the State's petition and the State's interpretation of *Hentzner:*

> On consideration of the petition for rehearing filed June 27, 1980,
>
> The opinion cannot reasonably be read to require that the prosecution prove the defendant had knowledge of the law and knew that he was breaking it; that meaning of the word "wilfully" is specifically rejected. [Slip Op. p. 12].
>
> The Petition for Rehearing is therefore denied.

Order dated July 23, 1980 in *Hentzner v. State,* File No. 3649.

The supreme court's denial of the State's petition for rehearing cites page 12 of its slip opinion (Opinion No. 2103). On that page, the court stated:

> The issue before us is the meaning of the word "wilfully" as used in AS 45.55.210(a). There are several possibilities. One is that the defendant must act intentionally in the sense that he is aware of what he is doing; another is that the defendant must be aware that what he is doing is illegal; and a third is that the defendant must know that what he is doing is wrong. It is in this last sense that we think "wilfully" should be interpreted as it is used in Section 210.

*Hentzner,* 613 P.2d at 825 (footnote omitted). This language from *Hentzner* indicates that the supreme court did not think it had imposed the mens rea requirement that Kinney argues for in the present appeal—the purported requirement that the government

---

**3.** A "grubstake" is "[m]oney or supplies advanced to a prospector in return for a share in any findings". *Webster's New World Dictionary* *of American English* (3rd College Edition, 1988), p. 597.

prove that the defendant acted with "knowledge of the law" and awareness "that he was breaking it".

With respect to securities prosecutions, this court has interpreted *Hentzner*'s "awareness of wrongdoing" requirement to mean that the State must prove that the defendant "recklessly disregarded" the fact that he was unlawfully selling unregistered securities—that the defendant consciously disregarded a substantial and unjustifiable risk that his conduct would result in a violation of the law. *Wheeler v. State*, 659 P.2d 1241, 1251–52 (Alaska App.1983). *Wheeler* remains the controlling authority on this point.

More relevant to Kinney's appeal, both *Wheeler* and *Steve v. State*, 875 P.2d 110, 122–23 (Alaska App. 1994), interpret *Hentzner* as a case in which the supreme court's "primary concern was to avoid application of strict liability in cases where the accused could be subjected to severe criminal penalties". *Wheeler*, 659 P.2d at 1251. Hentzner was charged with a felony, not for offering his investment scheme, but for failing to register it. Thus, Hentzner's crime was one of omission. "The gist of [Hentzner's] crime was ... the defendant's failure to perform an act required by law—registering the securities before offering them to the public." *Steve*, 875 P.2d at 122.

As this court noted in *Steve*, when a crime is defined in terms of a failure to act, "the prevailing view is that one may not be held liable if one does not know the facts indicating a duty to act". *Id.* (quoting *LaFave and Scott*, § 3.3(b), Vol. 1, p. 289). Thus, *Steve* interprets *Hentzner* as saying that if a person reasonably fails to perceive that his business activities fall within the securities laws, so that his failure to register is an act of reasonable inadvertence, then that person should not be guilty of a felony for failing to register.

 Kinney's case is substantially different. Kinney was charged with selling alcohol; his crime was one of commission, not omission. Kinney's sales of alcohol did not arise through inadvertence or neglect. Moreover, it is common knowledge in our society that one is not permitted to sell alcohol without a license, and it is common knowledge in Alaska that various localities have voted themselves dry. Under these circumstances,

> [w]hat is essential is not an awareness that a given conduct is a "wrongdoing" in the sense that it is proscribed by law, but rather, an awareness that one is committing the specific acts which are defined by law as a "wrongdoing". It is ... no defense that one was not aware his acts were wrong in the sense that they were proscribed by law. So long as one acts intentionally, with cognizance of his behavior, he acts with the requisite awareness of wrongdoing. In the words of Justice Holmes:
>
> > If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent.
>
> *Ellis v. United States*, 206 U.S. 246, 257, 27 S.Ct. 600, 602, 51 L.Ed. 1047, 1053 (1907).

*Alex v. State*, 484 P.2d at 681–82 (citations omitted).

It was not necessary for the State to prove that Kinney was aware of the bootlegging law and knew that his conduct violated that law. We therefore uphold the trial judge's refusal to give Kinney's proposed jury instruction.

*Did the legislature violate the constitution by not allowing a "no personal profit" defense when a defendant is charged with bootlegging in a dry community?*

 Under AS 4.11.010(a), no person may "manufacture, sell, offer for sale, possess for sale or barter, traffic in, or barter an alcoholic beverage" unless they have the proper license or permit. Under AS 4.16.200(a)-(b), a person who violates this licensing law is guilty of a class A misdemeanor unless the violation occurs in a local-option community, in which case the crime is a class C felony.

In AS 4.16.200(c), the legislature has provided a limited exception to the licensing

requirement: a person charged with unlicensed trafficking in liquor may defend by proving that "no profit was involved in the solicitation or receipt of [the] order for the delivery of [the] alcoholic beverage". There are two instances in which this "no personal profit" defense does not apply: when the defendant is charged with selling or offering to sell alcoholic beverages to a minor, and when the defendant is charged with liquor trafficking in a local-option community.

Kinney asserts that the legislature had no valid reason for restricting the "no personal profit" defense in this fashion. He argues that, because there is no rational basis for restricting the scope of the defense, the due process clause of the constitution requires that the defense be available to anyone accused of unlicensed sale of liquor, even if the offense occurred in a local-option community.

We disagree. The two limitations on the "no personal profit" defense appear to be based on the same rationale: lack of profit is no defense to unlicensed sale of liquor when it would be illegal for anyone to sell liquor under the same circumstances. Thus, the defense is not available to someone who sells liquor to a minor, nor is it available to someone who sells liquor in a community that has voted to ban liquor sales. In these situations, unlicensed sale of liquor is not just a violation of statutes that regulate alcohol sales and restrict the number of alcohol sellers; rather, the unlicensed sale violates society's determination that no one should sell alcohol under such circumstances. Because there is a rational basis for the legislature's decision to restrict the scope of the "no personal profit" defense, Kinney's due process attack fails. *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974); *Harrison v. State*, 687 P.2d 332, 343–44 (Alaska App.1984).

*Conclusion*

The judgement of the superior court is AFFIRMED.