**Cletus R. WHEELER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 5428.**

Court of Appeals of Alaska.

March 4, 1983.

Robert D. Buckalew and Paul L. Davis, Boyko & Davis, and Elizabeth I. Johnson, Anchorage, for appellant.

Timothy J. Petumenos and W.H. Hawley, Asst. Attys. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Judgment of conviction was entered against Cletus R. Wheeler following a jury trial for three counts of selling unregistered securities and three counts of fraudulent sale of securities.[1] Wheeler subsequently filed this appeal, in which he raises a number of issues. Upon consideration of Wheeler's arguments and review of the appellate record, we conclude that no error was committed; we therefore affirm.

### I.

### FACTS

Our disposition of Wheeler's claims first requires a review of the evidence concerning the transactions for which Wheeler was convicted. Wheeler's convictions arose from a business investment sales scheme planned and organized by him. The scheme involved sale in Anchorage of a program for acquiring and operating vending machines that dispensed snacks and candy bars. Wheeler conducted the scheme purporting to act as an officer of Spectrum Marketing, Inc. (Spectrum), a corporation based in Denver, Colorado, where Wheeler resided. According to Wheeler's testimony at trial, Spectrum had an agreement with a Colorado manufacturer named Vend-A-Matic to purchase vending machines for $395 each. Wheeler planned to sell the machines through Spectrum for $1,095 each. Wheeler developed a package of promotional materials, business documents and contracts, and he recruited an acquaintance

1. Wheeler's three sales of unregistered securities were alleged to have occurred in September, 1978; he was charged with these offenses under the provisions of AS 45.55.070 and AS 45.55.210. The securities fraud allegations, stemming from the same transactions, were charged under AS 45.55.010(3) and AS 45.55.-210. Wheeler was convicted on all six counts.

and former business associate, Daniel Rhoades, as a sales agent for Spectrum.[2]

Having completed plans for Spectrum's sales campaign, Wheeler placed an advertisement in the classified section of the Anchorage Times on September 11, 1978. The advertisement appeared in the following form:

BUSINESS OPPORTUNITY    POTENTIAL

HERSHEY BAR'S [sic]
MR. GOODBAR        REESE'S
RALLY      KIT KAT

Dispensed through ultra modern equipment. No investment required. Applicant must be a permanent resident available to start business immediately.

$700 WEEK FULL TIME
WE GUARANTEE $160 WEEK PART TIME

to our investors. Company furnishes direct outlets for candy; industry's finest dispensing equipment, high traffic locations and company capital for expansion purposes.

APPLICANT must be of sound character and have sincere desire to succeed in business. Investment available upon request. Applicant must have adequate working capital. Not affiliated with Hershey Foods Corp.

Call Mr. Simmons
Sun., Mon., Tues. Only
(907) 276–1525

Rhoades went to Anchorage in order to respond to inquiries from prospective investors. The name "Simmons" used in the advertisement was apparently an alias placed in the advertisement by Wheeler at Rhoades' request; however, once in Anchorage, Rhoades primarily dealt with potential investors using his true name.

Not long after Spectrum's advertisement was published, Rhoades received a number of inquiries from interested people. On

2. Rhoades was indicted as Wheeler's codefendant; he subsequently entered a negotiated plea of *nolo contendere* and testified against Wheeler at trial.

3. All four primary investors testified against Wheeler at trial. The investors, and the respective dates and the amounts of their investments, were as follows:

September 13 and 14, 1978, four investors signed contracts with Rhoades for purchase of a total of 110 vending machines; they paid a total of $20,500 to Spectrum as initial deposits on machines that they ordered.[3]

A nearly identical sales presentation was made by Rhoades to each customer. Rhoades offered two alternative plans for investment: plan A and plan B. Under plan A, "outside" investors were to provide capital for the purchase of new vending machines; machines would be placed by Spectrum in locations around Anchorage. Local purchasers were to pay no cash for the machines, but would be required to maintain, repair and stock them. Plan A required local purchasers to post a $3,000 performance bond. During the first year of operation under plan A, all profits from machines tended by a local purchaser were to be divided equally between the local purchaser and the outside investor. In the second year of the plan, the outside investor was to receive 70% of total receipts and the local purchaser would get 30%. Local purchasers were to acquire title to vending machines in which they invested after the first two years of the machines' operation.

Notably, Spectrum never intended to actually use plan A. According to Rhoades' testimony at trial, plan A was part of a "bait and switch" sales tactic. Rhoades and Wheeler would attempt to switch investors interested in plan A over to plan B. If this could not be accomplished, it was understood by Rhoades and Wheeler that some pretext would ultimately be used to make plan A unavailable.

| Purchaser's Name | No. Machines Purchased | Date of Purchase | Down Payment |
|---|---|---|---|
| Donald Lott | 30 | 9–14–78 | $6,000 |
| David Ebbert | 10 | 9–14–78 | $500 |
| Eric Kaufman | 20 | 9–14–78 | $4,000 |
| Waldo Carrasco | 50 | 9–13–78 | $10,000 |

Although David Ebbert testified at Wheeler's trial, his purchase from Spectrum was not the subject of any charges against Wheeler. The remaining three transactions formed the basis for the six counts with which Wheeler was charged, each transaction giving rise to one

Different terms were offered potential investors under Spectrum's plan B, the package that Wheeler and Rhoades actually intended to sell and in fact did sell in Alaska. Plan B involved direct sales of vending machines; a minimum purchase of ten machines was required. Investors under plan B were expected to pay an initial deposit of approximately 20% of the total purchase price before Spectrum would place an order for the machines. Thus, on its surface, plan B was structured to have the attributes of a simple commercial transaction.

Yet, as indicated in Spectrum's newspaper advertisement, plan B entailed substantially more than a straightforward commercial sale of vending machines. Rhoades told each of his Anchorage investors that all machines ordered under plan B would be stocked with candy or snacks; he further led investors to believe either that future supplies of candy at a price of 12½ cents per bar would be arranged by Spectrum or that Spectrum itself would act as supplier of candies at that price. According to Rhoades' sales presentation, Spectrum was to provide the services of experienced "locators," who would arrange for machines to be placed in desirable, high traffic locations around Anchorage. Rhoades told each purchaser that Spectrum's locators either already had negotiated or soon would negotiate location agreements with owners of the premises where the machines were to be placed; Rhoades assured investors that these location agreements would call for payment of only 3½ cents per bar of candy to location owners. Thus, Rhoades led investors to believe that Spectrum could assure profits of nineteen cents for each thirty-five-cent candy bar sold. Rhoades expressly told each investor that, by conservative estimate, the locations provided by Spectrum would result in average daily sales of thirty-five units per machine. By simple mathematical computation, Rhoades

demonstrated to his customers that annual earnings for ten machines would thus total slightly more than $24,000.

Other significant inducements were offered by Rhoades to garner investors for Spectrum's plan B. Rhoades assured each investor that Spectrum would give him exclusive rights to the Anchorage territory, and each was led to believe that, after an initial 20% cash deposit had been made, Spectrum was capable of financing the balance of the purchase price.[4] As part of the plan B package, Rhoades also expressly promised investors that they would be eligible to participate in an "expansion" program, the terms of which would allow them to purchase as many new machines from Spectrum as they desired after one year of operations. Spectrum committed itself to financing future investments under the expansion program at an annual rate of 8%, simple interest, over a six-year period. Spectrum further agreed to provide locations, on terms similar to those applicable to orginally purchased machines, for any vending machines purchased under the expansion program. Finally, plan B included a guarantee whereby Spectrum represented that it expected the minimum first-year income from each machine, after expenses (cost of candy and location fees), to be 110% of the initial purchase price. Spectrum guaranteed to pay investors the difference between the 110% figure and the amount actually received by investors in the event income fell below the minimum level expected. Significantly, the 110% income guarantee applied only as long as an investor agreed not to alter the location of any machine without securing prior written approval from Spectrum.

Key documentary evidence relating to Spectrum's sales in Alaska was also admitted at trial, and it corroborated, to a large extent, the testimony concerning Rhoades'

---

count of sale of an unregistered security and one count of securities fraud. The transaction involving Eric Kaufman was actually a joint investment by Kaufman and another man; the other investor did not testify at Wheeler's trial.

4. Kaufman and Lott testified that Rhoades had implied that financing would be available for their initial purchases; Carrasco stated that Rhoades expressly assured him that financing would be arranged through Spectrum. This was consistent with Rhoades' testimony.

verbal representations as to the broad scope of Spectrum's plan B offering. These documents were also highly probative of Wheeler's knowledge of the various inducements used by Rhoades to convince prospective investors to place an order.

Of the various documents, the most prominent were "sales agreements," which were preprinted contracts on Spectrum letterhead. Each investor, in conjunction with Rhoades, executed a sales agreement. The number of vending machines involved in each transaction, together with their purchase price, was filled in by Rhoades. As executed, the agreements obligated Spectrum to secure desirable locations for the machines that were sold. Originally, each agreement included a clause stating:

COMPANY agrees to secure initial locations for the placement of the above described equipment. It is expressly understood and agreed that COMPANY has not agreed to secure any specific location or locations. COMPANY will utilize its best efforts to secure desirable locations, but assumes no responsibility for the success or profitability of any location or number of locations. BUYER represents that COMPANY has not agreed to grant any exclusive territory or guarantee the gross or net receipts of any individual machine or aggregate number of machines.

In the case of each investor, Rhoades crossed out the language stating "but assumes no responsibility for the success or profitability of any location or number of locations," as well as the following sentence, which indicated that no exclusive territory or income guarantee had been given. In each case, the interlineated language of the contract was initialled by Rhoades.

The sales agreements executed by Rhoades and his Anchorage investors were, by their terms, made subject to approval by an officer of Spectrum within thirty days of execution. Rhoades transmitted all executed agreements to Wheeler, who signed them on the line provided for company approval, purporting to act as Spectrum's president. Wheeler mailed copies of the approved agreements back to individual investors.

Documents ancillary to the sales agreements were also significant in revealing the nature of Spectrum's offering. Each investor received a certificate spelling out the terms of the 110% income guarantee by Spectrum. Guarantee certificates were signed by Rhoades and individual investors and, like the sales agreements, were forwarded to Wheeler for approval. A separate certificate, emblazoned with the words "AGREEMENT" and "Credit and Expansion," was also executed by Rhoades and presented to each investor. These certificates gave details of the investors' right to buy additional machines from Spectrum and Spectrum's commitment to finance all future purchases. Finally, Rhoades signed and gave to each investor a certificate of warranty, pursuant to which Spectrum provided a direct warranty against any defect in parts or workmanship on the vending machines that had been sold.

Along with the approved copies of sales agreements and guarantee certificates that were returned to Alaska investors, Wheeler mailed personally signed letters congratulating investors on being approved by Spectrum and requesting them to pay, within ten days, the full balance of the purchase price on the machines that they had ordered. Wheeler's letter also stated that the investors' orders had been "scheduled with the factory for shipment" and that upon receipt of the unpaid balance, Spectrum would expedite the orders and "implement the location schedule."

According to Wheeler's testimony at trial, Spectrum did in fact place an order for 110 vending machines with the Vend-A-Matic Company shortly after receiving the Anchorage contracts. However, no machines were ever delivered to Alaska, and Spectrum never spent any funds on acquisition of machines.

Testimony concerning Spectrum's bank account indicated that it was opened by a deposit of $100 on September 7, 1978, shortly before Rhoades first traveled to Anchorage. The next deposit made was on Sep-

tember 18, 1978, for the sum of $20,000; it constituted the initial deposits given to Rhoades by three Anchorage investors who had signed sales agreements with Spectrum for a total of 100 machines. A $500 deposit was made the next day, consisting of a down payment made by Rhoades' fourth Anchorage investor. On the same day that he deposited the $20,000 in initial deposits from Anchorage, Wheeler wrote a check on Spectrum's account to Rhoades for $10,000, as an advance commission; he wrote another check to himself for $5,000. Over the next two months, funds from the Spectrum account were used to pay travel expenses of Rhoades and Wheeler and for other operating expenses. Additionally, Wheeler withdrew a substantial amount to secure the release of Rhoades on bail after Rhoades was arrested in Fairbanks in October, 1978. Rhoades' arrest resulted from a police investigation commenced in response to another advertisement placed in a Fairbanks newspaper. Wheeler closed Spectrum's account on December 4, 1978.

Undisputed evidence was presented by the state at trial that Wheeler did not formally incorporate Spectrum until after Anchorage investors had signed contracts with the company. At no time did Spectrum have contracts or arrangements with any candy suppliers, nor was Spectrum in a position to supply candy itself. Rhoades testified at trial that the wholesale price of 12½ cents per bar of candy that he used in his sales pitch was entirely speculative, or "blue sky." Similarly, Spectrum had never negotiated for or acquired vending machine

locations in the Anchorage area and had no plans to do so. No locators were hired, nor did a "location schedule" for placement of vending machines in Anchorage ever exist. The funds in Spectrum's bank account were the only corporate assets that the company had. Spectrum had no line of credit or other arrangements that might have enabled it to finance current or future purchase of vending machines by its investors. Based on Rhoades' testimony, there was ample evidence to indicate that Wheeler knew of and condoned the various verbal representations Rhoades had made to his Anchorage customers.[5]

With this background in mind, we proceed to a consideration of Wheeler's points on appeal.

## II.

### SUFFICIENCY OF THE EVIDENCE TO ESTABLISH THE EXISTENCE OF A SECURITY

Wheeler's primary argument is that the evidence at trial was insufficient to support the conclusion that Spectrum's vending machine sales program constituted a security under Alaska law. AS 45.55.130(12) defines a security under Alaska law; the statutory definition includes, in relevant part, any "investment contract" or any "investment of money . . . in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment or policy decision of the venture."[6] In this case, the

---

**5.** Rhoades testified that the sales presentation and the specific representations that he made to prospective investors in Anchorage constituted a standard sales pitch that he and Wheeler had used before. Wheeler gave Rhoades a demonstration of the sales pitch when he was recruiting Rhoades, and Wheeler had previously seen Rhoades do substantially the same presentation when they were working for other companies.

Additionally, two of Spectrum's Anchorage investors, Carrasco and Lott, specifically testified that after their agreements had been executed and approved they spoke by telephone with Wheeler, who confirmed in each case that Spectrum was giving the investor exclusive rights to the Anchorage territory.

**6.** AS 45.55.130(12), as it was written at the time of Wheeler's offense, provided:

(12) "security" means a note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificates; preorganization certificate or subscription; transferable share; *investment contract;* voting-trust certificate; certificate of deposit for a security; a certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease or in any sale of or indenture or bond or contract for the conveyance of land or any interest in land; an option on a contract for the future delivery of agricultural or mineral commodi-

jury was given instructions on both the "investment contract" and "risk capital" definitions of a security and, by special interrogatory, the jury was asked to specify, in the event it found Wheeler guilty, whether its finding was based on the investment contract definition, the risk capital theory, or both. The jury concluded that Wheeler was guilty under both definitions of a security. Accordingly, in order to sustain Wheeler's conviction, it is necessary only to conclude that there was sufficient evidence under either of the alternative definitions.

Until the decision in *Hentzner v. State,* 613 P.2d 821 (Alaska 1980), the question of what constitutes a security under AS 45.55.-130(12) had not been addressed by the Alaska Supreme Court. In *Hentzner,* 613 P.2d at 823–24, the court construed the term "investment contract," as used in the statute. *Hentzner* adopted the basic definition first stated by the United States Supreme Court in the landmark case of *Securities and Exchange Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey,* "investment contract" was defined as

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . .

ties or any other commodity offered or sold to the public and not regulated by the Commodity Futures Trading Commission; however, the contract for option is not subject to the provisions of AS 45.55.070 if it is sold or purchased on the floor of a bona fide exchange or board of trade and offered or sold to the public by a broker-dealer or agent registered under this chapter; *investment of money or money's worth including goods furnished or services performed in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the interest or policy decision of the venture;* or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing; "security" does not include an insurance or endowment policy or annuity

*Id.* at 299–300, 66 S.Ct. at 1103, 90 L.Ed. at 1249.

The court in *Hentzner,* however, indicated that the *Howey* test should not be applied rigidly or inflexibly. Thus, referring particularly to *Howey*'s requirement that an investment contract involve profits to be derived "solely from the efforts of the promoter," the *Hentzer* court, 613 P.2d at 823, cited with approval the holding in *Securities and Exchange Comm'n v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). *Turner* expressly held that the *Howey* definition does not preclude the finding of an investment contract where both the investor and the promoter are required to make some efforts in order to obtain a profit. The *Turner* court ruled that the *Howey* test is satisfied if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F.2d at 482.

■ Applying the flexible interpretation of the *Howey* standard approved by *Hentzner,* we are convinced that sufficient evidence was presented to support a jury finding that Spectrum's vending machine sales program was an investment contract. Viewed in the light most favorable to the state,[7] the evidence indicates that Rhoades, acting with Wheeler's knowledge and con-

contract under which an insurance company promises to pay a fixed sum of money either in a lump sum or periodically for life or for some other specified period. . . . [Emphasis added.]

7. The standard we must use to decide questions involving sufficiency of evidence at trial is well settled:

> In considering a motion for judgment of acquittal, both at trial and on appeal, the court "must take the view of the evidence and the inferences therefrom most favorable to the state. If . . . fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt," the motion must be denied.

*Hentzner v. State,* 613 P.2d 821, 823 (Alaska 1980) (quoting *Gray v. State,* 463 P.2d 897, 905 (Alaska 1970)).

sent, engaged in significantly more than a garden variety commercial sale of vending machines.

Vending machines are not inherently profitable; rather, their profitability depends upon availability at reasonable cost of merchandise to be sold and availability of space in areas where potential buyers can be found. When viewed in its totality, the evidence presented at trial is ample to support the conclusion that Spectrum, through advertisements, verbal representations to potential investors, and various investment documents prepared and signed by Wheeler and Rhoades, sold a package of contractual benefits which included, in addition to vending machines themselves, the precise experience, expertise and resources necessary to assure profits from the machines.

Spectrum represented to its investors that it would continue to provide, either directly or indirectly, a supply of candy and snacks at favorable wholesale prices. In addition, Spectrum agreed to lend its own skill and expertise in the vending machine business to place current and future machines in desirable, high traffic locations; these locations were to be provided by Spectrum at a cost that was advantageous to its investors. The extent to which Spectrum relied on the offer of its managerial skill and expertise as an inducement to prospective investors is evidenced by the 110% first year earnings guarantee and, in particular, by the provision in this guarantee that investors would forfeit the right to its benefits if they moved any machine without prior company approval. Spectrum's promises of unlimited future expansion, current and future financing at low interest rates, and exclusive rights to sell in the Anchorage area are further evidence of the fact that Spectrum marketed not just vending machines, but a program for acquisition and operation of machines which assured financial success.

■ Relying on the *Howey* standard, Wheeler nevertheless contends that there was insufficient evidence to support findings that Spectrum's program created a common enterprise or that investors were led to expect profits through "the sole efforts of the promoter." When all aspects of Spectrum's sales agreements are considered, however, we think it apparent that sufficient evidence existed to establish both a common enterprise and reliance by investors on the efforts of Spectrum to assure profits.

The common enterprise requirement of *Howey* "has come to mean only that the investors' financial interests must be 'inextricably interwoven' with those of the promoter or third party." *Hentzner v. State,* 613 P.2d at 824 (quoting *Securities and Exchange Comm'n v. Commodity Options International, Inc.,* 553 F.2d 628, 633 (9th Cir. 1977)). *See also Securities and Exchange Comm'n v. Glenn W. Turner Enterprises,* 474 F.2d at 482 n. 7. Here, Spectrum's program gave rise to a clear financial interdependence between investor and promoter. Spectrum's investors had a high stake in the company's financial success. Only if Spectrum proved to be successful could it be depended on to provide experienced personnel to negotiate for and obtain profitable locations for vending machines currently purchased and for machines that might be bought in the future pursuant to Spectrum's expansion agreement. Similarly, investors depended on Spectrum's continued financial security to assure that the company would be capable of fulfilling its commitments to arrange for supplies of candy at favorable prices, to furnish both present and future financing, to make additional machines available for future expansion, and to live up to its obligation under the 110% first year guarantee. For its part, Spectrum's interests depended heavily upon the success of its investors, since profitable operations by investors could be expected to result in future sales under the expansion agreement. Even more significantly, unsuccessful—or even marginally profitable—performance by investors might result in the need for Spectrum to expend potentially vast sums of money to reimburse investors pursuant to its 110% first year earnings guarantees. We therefore conclude that the evidence presented at trial was adequate to support a finding of common enterprise resulting from Spectrum's sale of its vending machine program.

A similar conclusion is warranted with respect to the second part of the *Howey* standard, which requires reliance by investors for profits on the "sole efforts of the promoter." As previously noted, this portion of the *Howey* test has been read to require a finding that the efforts to be made by a promoter could be characterized as "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." [8] It is undeniable that, under the terms of their agreements with Spectrum, investors were required to engage in substantial efforts to assure profits. It was incumbent upon investors to service and stock their vending machines regularly, to collect money from their machines, and to keep basic records of service to and income from the machines. Yet the investors' duties must be compared to the efforts that were undertaken by Spectrum. These efforts included negotiating for and obtaining high traffic locations for machines at nominal rates, installation of the machines on location, providing supplies at advantageous wholesale prices to stock the machines, providing future guidance as to relocation of machines operating at unprofitable locations, assuring exclusive sales territory to investors, providing financing for acquisition of machines, and making additional machines and locations available to investors for future expansion.

We think that the overall distribution of responsibilities that emerges from the evidence is a virtual paradigm of the division of efforts that has commonly been deemed to satisfy the "sole efforts" facet of the *Howey* standard: investors here were to make only routine efforts of a ministerial nature to advance their investments, while Spectrum undertook performance of managerial efforts—efforts which would require financial resources as well as experience and expertise in the trade, and which would ultimately determine the profitability of the venture. *See, e.g., Smith v. Gross,* 604 F.2d 639 (9th Cir.1979); *Miller v. Central Chinchilla Group, Inc.,* 494 F.2d 414 (8th Cir.1974); *Pratt v. Kross,* 276 Or. 483, 555 P.2d 765, 772–73 (Or.1976); *McClellan v. Sundholm,* 89 Wash.2d 527, 574 P.2d 371, 374 (Wash.1978). *See also Ek v. Nationwide Candy Division, Ltd.,* 403 So.2d 780 (La.App.1981) (sale of candy vending machines coupled with a guaranteed income refund policy and other obligations held to be a security).

We hold that the evidence produced at trial was sufficient to justify a finding that the "sole efforts" requirement of the *Howey* standard was met. It follows that the evidence was sufficient to show that Spectrum's marketing scheme, planned and executed by Wheeler, involved the sale or offering of an "investment contract" within the meaning of AS 45.55.130(12).[9] The trial court thus correctly denied Wheeler's motion for judgment of acquittal based on insufficiency of the evidence to show that a security was involved in Wheeler's transactions.

### III.

### ADEQUACY OF JURY INSTRUCTIONS ON CRIMINAL INTENT AND GOOD FAITH

We next consider Wheeler's complaint that the trial court improperly instructed

---

**8.** *Securities and Exchange Comm'n v. Glenn W. Turner Enterprises,* 474 F.2d at 482.

**9.** Wheeler also argues that no common enterprise arose and that the "sole efforts" standard was not met because investors, after paying for their vending machines, were free to use them as they desired and could have located the machines wherever they wanted to or purchased supplies from any source they chose. This argument misses the point. In most contractual arrangements, a party is free to accept less than he is entitled to receive under the terms of the contract. Spectrum's investors were free to do as they pleased in this sense, and this sense only. We believe that the existence of a security should properly be determined by looking to the contractual terms of an offering, as evidenced by a promoter's representations to and agreements with potential investors, rather than by focusing on the "freedom" of investors to accept less than they bargained for. In this case it appears that, as a result of written and verbal representations made by Spectrum, investors entered into contracts which purported to entitle them to significantly more than mere title to and possession of vending machines.

the jury on the related issues of criminal intent and good faith. Wheeler initially directs his attack at the adequacy of the trial court's instructions concerning the necessary level of criminal intent. The trial court gave identical instructions as to each of the three counts that charged Wheeler with sale of an unregistered security. Wheeler contends that each of the three instructions was improper and that the trial court should have granted his request to give instructions requiring the jury to find, as to all elements of the counts charging the sale of unregistered securities, that he acted "knowingly and deliberately with bad purpose."

While the issue of intent that Wheeler raises is conceptually a difficult one, its resolution is in large measure controlled by the decision in *Hentzer v. State,* 613 P.2d at 824–29, which, like the present case, dealt with a charge of selling unregistered securities in violation of AS 45.55.210(a). Addressing the issue of intent, the court in *Hentzner* acknowledged that AS 45.55.-210(a) expressly required the conduct of the accused to be committed "wilfully." [10]  *Id.* at 825. The court noted three alternative interpretations of the statute's wilfulness requirement:

> The issue before us is the meaning of the word "wilfully" as used in AS 44.55.-210(a). There are several possibilities. One is that the defendant must act intentionally in the sense that he is aware of what he is doing; another is that the defendant must be aware that what he is doing is illegal; and a third is that the defendant must know that what he is

doing is wrong. It is in this last sense that we think "wilfully" should be interpreted as it is used in Section 210.

*Id.* (footnote omitted).

In reaching this conclusion, the supreme court relied strongly upon its traditional aversion to the use of strict liability in cases involving criminal penalties. *Id.* at 826–27, 829. The court reasoned that, when an offense is only *malum prohibitum* in nature, there is no broad societal concurrence as to the wrongfulness of the prohibited act. The court concluded that, for this reason, in such cases the term "wilfully" should be defined to require the jury to make a finding that the accused possessed an awareness of wrongdoing in committing the offense. *Id.* at 826, 828–29. Finding the sale of unregistered securities to be a *malum prohibitum* offense, the court held that the jury should have been instructed that an awareness of wrongdoing was required for Hentzner's sale to be deemed wilful. *Id.* at 828–29.

The court in *Hentzner* did not discuss the definition or scope of the *mens rea* standard that it established by requiring awareness of wrongdoing as a component of wilfulness. The question before us in the present case is whether the trial court's instructions on the counts charging Wheeler with sale of unregistered securities [11] satisfied *Hentzner's* awareness of wrongdoing standard.

As previously noted, the trial court's instructions on the elements of sale of unregistered securities were identical as to each count. Each instruction required, as the first element of the offense, that the jury find that Wheeler acted "willfully." [12]

10. AS 45.55.210(a) provides, in relevant part: *Criminal penalties.* (a) A person who wilfully violates a provision of this chapter except AS 45.55.160, or who wilfully violates a rule or order under this chapter, or who wilfully violates AS 45.55.160 knowing the statement made to be false or misleading in a material respect or the omission to be misleading by any material respect, upon conviction, is punishable by a fine of not more than $5,000, or by imprisonment for not less than one year nor more than five years, or both.

11. The trial court's instructions on the three counts charging Wheeler with fraudulent sale

of securities required only that the jury find a specific intent to defraud, expressly omitting any requirement of knowledge with respect to the fact that securities were being sold. Wheeler has not challenged the trial court's instructions with respect to these three counts.

12. A general definition of "wilfully" was given by the court in a separate instruction. "Wilfully" was defined for the jury as follows:

> An act is done wilfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say with bad purpose either to disobey or to disregard the law.

However, in setting out the fourth element of the offense, each instruction specified that the jury could reach a guilty verdict if it found that Wheeler acted "[w]ith reckless disregard for the fact that the business opportunity being offered was a security." [13]

■ Although the trial court's simultaneous use of the standards of wilfulness and reckless disregard within each of the three instructions that described the necessary elements of sale of an unregistered security might appear to be somewhat inconsistent, we think these instructions, on the whole, adequately informed the jury of the criminal intent requirement formulated by the trial court. We further believe that this requirement comported with the mandate of *Hentzner.*

A common sense reading of the trial court's instructions strongly suggests that their net effect was to inform the jury that,

at the very least, it would be required to find that Wheeler's conduct was voluntary and deliberate and that he either actually knew he was unlawfully selling unregistered securities or he recklessly disregarded that fact.[14] Wheeler asserts that this use of the "reckless disregard" standard of criminal intent subjected him to conviction based upon a lesser standard than the awareness of wrongdoing standard mandated by *Hentzner.* We disagree.

*Hentzner's* primary concern was to avoid application of strict liability in cases where the accused could be subjected to severe criminal penalties. In the present case, it is significant that the trial court's jury instruction defining "reckless disregard" closely tracked the definition of criminal recklessness that is contained in the Alaska Revised Criminal Code.[15] This court has recently stated that

13. As an example of the instructions at issue, we quote a portion of the relevant instruction given in connection with the transaction involving Waldo Carrasco:

> The necessary and material allegations of Count V, each of which the state must prove beyond a reasonable doubt before you can find the defendant guilty, are as follows:
> 1. That on or about September 19, 1978, while outside the state of Alaska, Cletus R. Wheeler did wilfully and unlawfully;
> 2. Sell a security to Waldo Carrasco at or near Anchorage, Third Judicial District, State of Alaska;
> 3. Said security having not been registered at the time of its sale as required by the Alaska Securities Act;
> 4. With reckless disregard for the fact that the business opportunity being offered was a security.

14. It is possible, as the state argues, that the jury construed the court's general reference to wilfulness at the outset of each instruction as requiring a finding that Wheeler acted with actual knowledge that sales were in fact securities. This could have occurred if the jury strictly followed the definition of "wilfully" that was separately given by the court, and if the jury considered the wilfulness requirement listed in the first element of the offense to override the somewhat inconsistent standard of reckless disregard mentioned as the fourth element of the offense. As Wheeler correctly argues, however, the possibility that a jury would read the instructions in this manner seems relatively remote. In any event, assuming such a reading was given to the trial court's instruc-

tions by the jury, it would have resulted in a more stringent intent requirement than the standard of "reckless disregard." Since this alternative reading of the instructions would have worked in Wheeler's favor, our discussion of the intent issue will assume that the jury applied the "reckless disregard" standard in determining whether Wheeler acted with the requisite level of criminal intent as to the fact that his transactions involved the sale of securities.

15. AS 11.81.900(a)(3) provides, in relevant part:

> (3) a person acts "recklessly" with respect to a result or to a circumstance described by a provision of law defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . .

The instruction on recklessness given by the trial court to the jury in this case stated:

> A person acts recklessly in connection with the sale of a security when he is aware of and consciously disregards a substantial and unjustifiable risk that the business venture he sells is a security. The risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the same circumstances.

[t]he definitions contained in the Revised Criminal Code for both recklessness—AS 11.81.900(a)(3)—and negligence—AS 11.-81.900(a)(4)—were expressly formulated to preclude mere civil negligence from forming the basis for a criminal conviction. Thus, both recklessness and criminal negligence require a "gross deviation" from the standard of care that "a reasonable person would observe in the situation."

*Andrew v. State,* 653 P.2d 1063, 1066 (Alaska App.1982) (footnote omitted). We further observed that the definition of recklessness set out in AS 11.81.900(a)(3), unlike the statutory definition of negligence, expressly incorporates a subjective component: actual awareness and conscious disregard by the accused of "a substantial and unjustifiable risk" that his conduct may result in a violation of the law. *Id.* at 1065.

In this case, the trial court's use of the recklessness standard, as defined in AS 11.-81.900(a)(3), appears to meet *Hentzner's* chief concern. Reliance on the statutory definition of recklessness provided ample assurance that Wheeler would not be convicted of selling unregistered securities based upon application of strict liability or upon a mere finding of civil negligence. *Hentzner's* purpose of preventing imposition of criminal penalties based upon strict liability was therefore fulfilled by the instructions adopting the recklessness standard.

We further conclude that the trial court's choice of criminal recklessness as the requisite measure of criminal intent was appropriate as a means of implementing the awareness of wrongdoing requirement expressly adopted in *Hentzner.* The subjective component of criminal recklessness seems entirely consistent with the awareness of wrongdoing standard. When the accused is subjectively "aware of and consciously disregards a substantial and unjustifiable risk" that his conduct may be unlawful or that it may lead to unlawful results, it is difficult to imagine how he could realistically be said to have acted without an awareness of wrongdoing. Moreover, a more stringent definition of the awareness of wrongdoing standard than that contained in AS 11.81.900(a)(3) would require subjective knowledge by the accused that his conduct was in fact illegal. Subjective knowledge of illegality was, however, expressly rejected as a definition of wilfullness by the court in *Hentzner.*

Accordingly, we hold that the trial court's use of criminal recklessness as a measure of the criminal intent requirement applicable to Wheeler's charges of selling unregistered securities fully complied with the court's duty, under *Hentzner,* to inform the jury that Wheeler could be convicted only if he acted with an awareness of wrongdoing.

■ Wheeler's next two points involve the trial court's instructions on the issue of good faith as a defense to the charges of selling unregistered securities. Wheeler maintains that the court erred in refusing to give a proposed instruction stating that a good faith belief on his part that he was not offering a security for sale would be a defense. This claim can be readily disposed of.

Wheeler's good faith defense theory was predicated almost entirely upon his own testimony that he had planned and organized Spectrum's sales program based on advice that he received from an attorney. Wheeler had been arrested in Oklahoma in the summer of 1978 on charges of selling securities without a license; he testified at his trial in the present case that while his Oklahoma charges were pending against him he discussed vending machine sales with his attorney in that case. According to Wheeler, his attorney gave him advice on how a vending machine sales program might be structured so that it would not be a security, and Wheeler relied on this advice in putting Spectrum's program together. Because the trial court gave a specific instruction on Wheeler's theory of defense, expressly informing the jury that good faith reliance on advice of an attorney would constitute a defense to the counts charging Wheeler with sale of unregistered securities, we conclude that no error result-

ed from the trial court's refusal to give a more generalized good faith instruction.[16]

■ Wheeler also challenges the adequacy of the trial court's instruction concerning reliance on advice of counsel as a defense.[17] Based on Wheeler's testimony concerning the advice he received from his Oklahoma attorney, the trial court instructed the jury as follows:

> The defendant claims that he is not guilty of wilful wrongdoing because he acted on the basis of advice from his attorney.
>
> If the defendant before taking any action sought the advice of an attorney whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, and made a full and accurate report to his attorney of all material facts of which he has the means of knowledge, and acted strictly in accordance with the advice of his attorney given following his full report, then the defendant would not be wilfully doing wrong in doing or omitting something the law forbids or requires, as that term is used in these instructions.
>
> Whether the defendant acted in good faith for the purpose of seeking guidance as to questions about which he was in doubt, and whether he made a full and complete report to his attorney, and whether he acted strictly in accordance with the advice received, are questions for you to determine.

Wheeler claims that this instruction was inadequate and that an instruction proposed by him and rejected by the trial courts should have been given in its place. Wheeler's proposed instruction differed from that given by the court in two respects. First, it would have deleted reference to the requirement that advice must have been sought "on the lawfulness of [the defendant's] possible future conduct." Second, it would have added a sentence stating: "Reliance in good faith on the advice of an attorney is evidence of the defendant's state of mind as to knowledge and wilfulness."

Wheeler argues that it was improper for the court to restrict its advice of counsel instruction to advice sought for the purpose of determining the lawfulness of future conduct. He reasons that, for the purpose of determining lawfulness of present conduct, it should be permissible to rely on advice previously given by an attorney, even if that advice was originally solicited

---

16. Although it has not specifically been argued on appeal, Wheeler's good faith defense theory might also have been premised on his testimony that he was unaware of and did not approve many of the misrepresentations made by Rhoades to Alaska investors. To the extent that Wheeler might have relied on this defense at trial, we believe that the court's instructions on the necessary elements of the offenses with which Wheeler was charged and its instructions informing the jury on applicable law pertaining to accessory liability were sufficient to allow presentation of the good faith claim by Wheeler, without the need for an independent good faith instruction. As the state correctly notes, a generalized good faith instruction is simply the converse of instructions setting forth the criminal intent that must be established before guilt can be found. Accordingly, it has been held that failure to give a general good faith instruction does not constitute error if other instructions properly set forth the elements charged. *See, e.g., United States v. Rothman,* 567 F.2d 744, 752 (7th Cir.1977); *United States v. Tortorello,* 480 F.2d 764, 785 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

Moreover, as to the three counts charging Wheeler with fraudulent sale of securities, the trial court did give the jury a good faith instruction, which expressly permitted consideration of Wheeler's good faith in determining whether he acted with specific intent to defraud Spectrum's investors.

17. The applicability of reliance on advice of counsel as a defense to criminal charges has not previously been considered by this court or by the Alaska Supreme Court. Acceptance of this defense is far from universal, and commentators have noted sound reasons for its rejection. *See, e.g.,* Model Penal Code § 2.04 (1962); W. LaFave & A. Scott, Criminal Law § 47, at 368–69 (1972). Because we are not required in this case to decide whether it was appropriate for the trial court to give an instruction on the advice of counsel defense, we express no view as to whether such a defense should formally be recognized under Alaska law.

in relation to other matters. In context, Wheeler's claim is entirely without merit. In the course of his own testimony—which was the sole basis upon which Wheeler's advice of counsel defense was premised—Wheeler stated that he had solicited advice from his Oklahoma attorney as to what type of vending machine sales program might constitute a security for the express purpose of planning how to establish Spectrum. Given this testimony, we fail to see how Wheeler could have been prejudiced by the restriction contained in the trial court's advice of counsel instruction.

We find Wheeler's second contention regarding the advice of counsel instruction to be equally devoid of merit. Wheeler claims that the trial court improperly refused to include in its advice of counsel instruction the language of his proposed instruction stating that good faith reliance on advice of counsel was relevant to the issue of his wilfulness and knowledge. The advice of counsel instruction used by the court followed, almost verbatim, the pattern instruction set out in 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 14.12, at 396 (3rd ed. 1977). Contrary to

Wheeler's assertions, this instruction directly addressed the relationship between good faith reliance on advice of counsel and the element of wilfulness, providing in relevant part that if the defendant, in good faith relied on advice given by his attorney, "then the defendant would not be wilfully doing wrong . . . as that term is used in these instructions." We conclude that the advice of counsel instruction given by the trial court adequately apprised Wheeler's jury of the relationship between reliance on advice of counsel and the element of wilfulness.[18]

## IV.

## FAILURE TO GRANT A NEW TRIAL DUE TO ALLEGED MISCONDUCT BY A JUROR

The final issue raised by Wheeler involves the trial court's failure to grant motions for a new trial based upon the alleged misconduct of a juror. Shortly after Wheeler was convicted, his trial counsel, Paul Davis, learned that Leo Bailey, foreman of the jury that convicted Wheeler,

---

**18.** The trial court restricted application of its instructions on the advice of counsel defense to the three counts charging Wheeler with sale of unregistered securities. Wheeler has not expressly challenged the trial court's decision refusing to extend the advice of counsel defense to the three counts charging him with fraudulent sale of securities. However, in his reply brief, Wheeler seems to imply that restriction of the advice of counsel defense to the three counts involving sale of unregistered securities was arbitrary. Similarly, in arguing that a general good faith instruction should have been given, Wheeler's opening and reply briefs imply that the court's instruction on the advice of counsel defense could not serve as a substitute for a general good faith defense instruction because a proper good faith defense instruction would have been applicable to Wheeler's charges of fraudulent sale of securities as well as to the charges of selling unregistered securities.

The holding of the Alaska Supreme Court in *Hentzner v. State,* 613 P.2d at 824–29, strongly suggests that, where securities violations involve a component of fraud and are thereby *malum in se* rather than *malum prohibitum,* an instruction requiring a finding of specific intent to defraud would suffice, without the need for

an independent finding of an awareness of wrongdoing as to the fact that the fraudulent transaction involved a security. This reading of *Hentzner* finds strong support in at least one relatively recent ruling of the United States Court of Appeals for the Ninth Circuit. *United States v. Brown,* 578 F.2d 1280, 1284–85 (9th Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 315, 58 L.Ed.2d 322 (1978).

In this case, however, it is not strictly necessary for us to decide whether *Hentzner's* requirement of an awareness of wrongdoing as to the fact that a security is involved would be applicable to charges of fraudulent sale of securities or to other securities violations that could be characterized as *malum in se.* Because the three counts of fraudulent sale of securities charged against Wheeler arose from the same transactions as the three counts of sale of unregistered securities, and because appropriate criminal intent instructions were given in connection with the sale of unregistered securities charges, the jury's verdicts convicting Wheeler of all three counts of selling unregistered securities would suffice to cure any error arising from the trial court's failure to separately instruct on awareness of wrongdoing in connection with the counts charging fraudulent sale.

was under indictment by the state for perjury and offering false evidence. Davis further learned that these charges arose from testimony and evidence that Bailey had presented as a defense witness in a misdemeanor trial prosecuted by the Municipality of Anchorage against Paula Newman. Newman had been represented in the municipal case by Davis' law partner, Edgar Paul Boyko. Newman had also been indicted for perjury and offering false evidence as a result of her testimony in the municipal case. State prosecutors had subpoenaed Boyko to testify before the grand jury that indicted both Newman and Bailey.

The fact that Bailey weathered the *voir dire* process and sat as a juror in Wheeler's case appears to have been the combined result of relative inattention by counsel [19] and incorrect or misleading answers given by Bailey to questions posed on *voir dire.* During selection of Wheeler's jury, Bailey was never told that Paul Davis and Edgar Paul Boyko worked together as partners in legal practice. Nor was Bailey asked whether he had ever been charged with a crime. However, Bailey indicated, in response to a question contained in a written jury questionnaire, that he had never been a party to a lawsuit; he gave the same answer when questioned on *voir dire.* Additionally, Bailey stated on *voir dire* that he had only had contact with the criminal justice system on one prior occasion, that being as a witness in a city case in 1968.

Upon discovering Bailey's status and the fact of his involvement in the Newman case, Wheeler, through counsel, filed motions for a new trial. In his first motion, Wheeler alleged that Bailey had given false or misleading answers during *voir dire,* that Bailey might have been prejudiced against and resentful of Wheeler's counsel because of his association with Edgar Paul Boyko,

and that, because Boyko had in effect acted as Bailey's accusor in testifying before the grand jury that indicted Bailey and Newman, Wheeler would have been entitled to disqualify Bailey for cause if the fact that Bailey had charges pending against him had been revealed. Wheeler's second motion for a new trial, based upon the same factual allegations, raised the further assertion that Bailey's non-disclosure deprived Wheeler of his right to informed and intelligent exercise of peremptory challenges during jury selection.

The state opposed Wheeler's motions. In so doing, it presented the trial court with an array of evidence and information to bolster its opposition. Wheeler's prosecutor submitted his own affidavit indicating that the state's prosecution against Bailey had at all times been handled by a separate branch of the attorney general's office and that he had no knowledge of the charges against Bailey until after Wheeler's trial had ended. The state further presented an affidavit executed by Bailey himself, in which he explained that his misleading answers on *voir dire* were unintentional and resulted from misunderstanding and confusion. Bailey's statement that he was a witness in a 1968 city case was actually a reference to his involvement in the Newman case, according to the affidavit; Bailey stated that he merely misspoke himself, intending to say "1978." Bailey went on to indicate that he was not aware before or during Wheeler's trial that Wheeler's attorney was associated with Edgar Paul Boyko. Bailey indicated that, in any event, he harbored no animosity toward Boyko and did not believe that Boyko's testimony before the grand jury was particularly incriminating or that Boyko acted as his accusor in giving grand jury testimony. Bailey concluded by stating that he was not in any

---

**19.** Bailey was one of the last jurors to be selected in Wheeler's case. He was part of a small supplemental panel of jurors called into Wheeler's courtroom toward the end of the jury selection process, when the jury panel originally summoned was exhausted before a full jury could be selected. The record indicates that members of the supplemental panel in which Bailey was included were subjected to only cursory *voir dire* by the prosecution and the defense.

**1256**

way prejudiced against Wheeler and that his participation as a juror in Wheeler's trial was based solely on a fair and impartial consideration of the evidence presented at trial.

Bailey's affidavit was corroborated by affidavits of five other members of Wheeler's jury. The affidavit of each juror confirmed that, during deliberations, Bailey had never indicated any prejudice against Wheeler or his attorney, that Bailey had never mentioned the criminal charges pending against him or any other extraneous matters, and that Bailey had at all times restricted his comments to the evidence presented at Wheeler's trial. In addition to these various affidavits, the state presented the trial court with a transcript of the grand jury proceedings that led to Bailey's indictment; the state's purpose in submitting the transcript was to demonstrate that Boyko's testimony concerning Bailey was essentially neutral in character and did not directly incriminate him. Thus, the state maintained that the transcript corroborated Bailey's affidavit by indicating that the nature of Boyko's testimony could not reasonably be expected to have caused Bailey to be hostile toward Boyko.

After considering all of the materials presented by Wheeler and the state in connection with the motions for a new trial, the trial court denied Wheeler's motions. Wheeler now contends that a new trial should have been granted; he argues that Bailey's non-disclosure should be deemed to create a presumption of prejudice on Bailey's part because it denied Wheeler of his right to exercise peremptory challenges in an informed and intelligent manner.

The correct legal standard for determination of this issue was recently discussed by the Alaska Supreme Court in *Fickes v. Petrolane-Alaska Gas Service,* 628 P.2d 908 (Alaska 1981), a case involving a similar, though distinguishable, claim of juror misconduct. In *Fickes,* 628 P.2d at 910, the court reaffirmed the two-tier standard for resolving claims of juror misconduct that

was first adopted in *West v. State,* 409 P.2d 847, 852 (Alaska 1966):

Whether the verdict should be set aside and a new trial ordered rests in the sound discretion of the trial judge, but generally the verdict should stand unless the evidence clearly establishes a serious violation of the juror's duty and deprives a party of a fair trial.

Applying this test, the court in *Fickes* concluded that a new trial was required in light of the evidence of misconduct that had been presented. The record in *Fickes* indicated that a juror had either negligently or intentionally failed to disclose, during *voir dire,* that he knew an important witness in the case, and that, during deliberations, the juror expressly argued that he knew the witness and that the jury could count on the witness' competence and reliability. 628 P.2d at 910.

By contrast, in Wheeler's case, there was nothing presented to the trial court indicating that the pending charges against Bailey or Bailey's familiarity with Edgar Paul Boyko had any influence on the jury's deliberation or in any way affected Bailey's consideration of the case. There was, to the contrary, substantial evidence to indicate that Bailey did in fact participate as a fair and impartial juror and that nothing of a prejudicial or improper nature tainted the jury's verdict.

It was well within the permissible range of the trial court's discretion to conclude that Bailey's affidavit was truthful in stating that his misleading answers had been unintentional. Even assuming that Bailey was so negligent in responding to *voir dire* questions that his misleading answers could, in and of themselves, constitute a "serious violation of a juror's duty," only the first tier of the *West* standard would be satisfied. The two-tier standard for resolving claims of juror misconduct adopted in *West* and reaffirmed in *Fickes* precludes consideration of Wheeler's argument that a presumption of prejudice should be deemed to arise as a result of Bailey's non-disclosure. A showing that Wheeler was actually de-

prived of a fair trial is required. We believe that ample evidence was submitted below to permit the trial court, in the exercise of its discretion, to conclude that Bailey's non-disclosure and his consequent participation as a juror in Wheeler's case did not deprive Wheeler of a fair trial.

We thus conclude that Wheeler has not satisfied his burden of demonstrating that the second tier of the *West* standard was established. Accordingly, we hold that the trial court's refusal to order a new trial did not constitute an abuse of discretion.

The judgment of conviction is AFFIRMED.