AMERICAN GOLD & DIAMOND COR-
PORATION, a Utah corporation, John
Crooks, Frank L. Davis, Dennis Frank,
Gem-Mart Consultants, Inc., Indepen-
dent Jewelry Appraisers, and United
States Distributor, Inc., Appellants,

v.

Willis F. KIRKPATRICK, Administrator
of Securities, Department of Commerce
and Economic Development, Division
of Banking and Securities for the State
of Alaska, Appellees.

No. 7608.

Supreme Court of Alaska.

March 16, 1984.

Philip R. Linsley, Sherman Oaks, Cal.,
and R.J. Smith, Anchorage, for appellants.

Jeffrey W. Bush, Asst. Atty. Gen., Ju-
neau, and Norman C. Gorsuch, Atty. Gen.,
Juneau, for appellees.

Before BURKE, C.J., and RABINOW-
ITZ, MATTHEWS, COMPTON, and
MOORE, JJ.

OPINION

MATTHEWS, Justice.

This appeal presents the sole issue of
whether a program offered by the appel-
lants for sale in Alaska constitutes an in-
vestment contract, and hence a security
subject to registration with the State Divi-
sion of Banking and Securities (hereafter

the Director), appellee, before being offered to customers in Alaska. The superior court, Judge Rodger Pegues presiding, affirmed the Director's determination that the program, which involved the sale of "territorial distributorships" of gemstones, constituted a security subject to registration. We affirm.

## I. THE PARTIES AND PROCEEDINGS.

The appellants are a group of corporations and individuals [1] who market the "territorial distributorships" of gemstones. They are hereafter referred to jointly as the promoters.

On February 9, 1981, Willis F. Kirkpatrick, Director of the Division of Banking and Securities, issued a Temporary Order to Cease and Desist upon a finding that the sales of the territorial distributorships constituted the sale of unregistered securities within Alaska. On November 6, 1981, Kirkpatrick issued his Findings of Fact, Conclusions of Law, and Order making permanent the prior cease and desist order. The superior court affirmed the Director's decision on January 24, 1983. The promoters appealed to this court.

## II. THE TERRITORIAL DISTRIBUTORSHIP PROGRAM.

The promoters' sale of territorial distributorships purports to establish a relationship analogous to a typical franchise arrangement. Each territorial distributor receives an exclusive thirty-four year right to market the promoters' gems and gold jewelry within a certain geographic territory.

The Territorial Distributorship Agreement, the contract between the promoters and a distributor, provides that in exchange for an individual purchasing a distributorship and buying the promoters' product, the promoters will provide the distributor a variety of services.[2] The promoters claim to have various confidential relationships with gem experts as well as connections with a "central selling organization," to assure high quality products and to act as a buffer to temporary fluctuations in gem prices. The promoters agree to provide gems to local distributors at 20% to 40% of retail price. Finally, they warrant that so long as the local distributorship adopts the accrual method of accounting, the promoters will supply, at their expense, a defense to any Internal Revenue Service challenge to the tax benefits of the program. In order to ensure funding of any such tax defense, the promoters have set up a trust account.

The Territorial Distributorship Agreement also contains certain clauses containing representations by the distributor. These clauses state that the distributor has sufficient business experience to operate the business, has the financial capacity to develop the territory, intends to personally promote the product, and understands that his profits will depend solely upon his own management and marketing ability.

In spite of these clauses, the territorial distributorship program is represented

---

**1.** American Gold & Diamond Corporation (American Gold) is a Utah corporation. The president of the corporation is Frank L. Davis. Its initial capital and operating funds were provided by John Crooks through Professional Escrow Account, Inc. (PEA).

American Gold sells "territorial distributorships" to individuals through United States Distributor, Inc., which provides a tax opinion letter to each territorial distributor and prepares the Territorial Distributorship Agreements.

Investment Opportunities, Unlimited (Investment Opportunities), a trust, is represented by Dennis Frank, whose business card describes Investment Opportunities representatives as "Specialists, Tax Sheltered Business." Territorial distributors make their payments to Invest-ment Opportunities for forwarding to PEA and American Gold.

Gem-Mart Consultants, Inc. (Gem-Mart), is a subsidiary of American Gold. Each territorial distributor is required to enter into a contract with Gem Mart, which provides various services to the territorial distributor.

Independent Jewelry Appraisers examines gems on behalf of the territorial distributors, through Gem Mart, and provides a "certificate of value" for them.

**2.** The promoters retain the absolute right to disapprove any assignment of a distributorship interest and the right to require a distributor to sell and advertise products of the promoters exclusively when this is not contrary to law.

elsewhere in the promotional materials as creating a business opportunity which the promoters will exclusively operate for the distributor. The distributor simply is to collect the profits and use the tax write-offs. A summary of the program prepared by the promoters begins:

> THIS SUMMARY OF BUSINESS OP-PORTUNITY DEFINES A TAX SHEL-TERED BUSINESS WHICH YOU CAN OWN, BUT OPERATE EXCLUSIVELY THROUGH AN INDEPENDENT MER-CHANDISING AGENCY. THE AGEN-CY WILL FIND THE CUSTOMERS, DO THE WORK AND SHARE THE PROF-ITS. THE NET RESULT IS: A. A 1979 BUSINESS EXPENSE DEDUCTION OF FOUR TIMES THE CASH PAID; B. A BUSINESS OPERATION WHICH SUP-PORTS THE WRITE OFF; C. PROF-ITS.

Furthermore, a local distributor is required to sign a consulting contract with the promoters when purchasing a local distributorship. This contract states that the promoters will provide education and sales materials, attempt to secure the distributor a business license and insurance, assist with the selection of personnel, distribute catalogues and solicitation materials to potential buyers, and generally advise and educate the distributor on how to run the business.

One of the promoters elaborated on services which could be expected under this contract; stating:

> We will assist the territorial distributors in finding appropriate location for an investment center. We will advise them cost of the same, furniture, cost of material for educational purposes ... and generally do the leg-work for the territorial distributor.

> ... We will contact for the territorial distributor various jewelry stores and see if they are willing to take on the product on a consignment basis.
> ... We'll assist the territorial distributor in setting up a jewelry party.

> .    .    .    .    .

> ... We would supply the information to the territorial distributor as far as educating these potential investors or potential buyers of their product and show possibly jewelry or stones for them, help them in showing their stones and jewelry items for sale.

Another promoter testified:

> Basically that it was set up as a—to help a lot of these people that are going to be territorial distributors or that are territorial distributors, are not knowledgeable on how to market their goods and set up to consult them on ways and means to help market the gems and stuff that they will be buying for inventory and for selling.

## III. DISCUSSION.

AS 45.55.070 provides in part that, "[i]t is unlawful for a person to offer or sell a security in this state unless (1) it is registered under this chapter...." A security is defined in AS 45.55.130(12) as, among other things, an "investment contract." [3]

The basic definition of an investment contract [4] was set out by the United States Supreme Court in *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1944).[5] The court in *Howey* defined the term as:

> [A] contract, transaction or scheme whereby a person [1] invests his money

---

3. A security may also be an "investment of money or money's worth including goods furnished or services performed in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment or policy decision of the venture...." AS 45.55.130(12). Since we hold that the territorial distributorship program is an investment contract, we need not consider whether the program qualifies as a security under this "risk-capital" test.

4. *See generally* Annot., 47 ALR 3d 1375 (1973); Annot., 3 ALR Fed. 592 (1970).

5. Federal cases interpreting the registration provisions of the Securities Act of 1933 have been used in Alaska to provide assistance in interpreting the analogous Alaska registration requirements. *See Hentzner v. State,* 613 P.2d 821 (Alaska 1980); *Wheeler v. State,* 659 P.2d 1241 (Alaska App.1983).

[2] in a common enterprise and [3] is led to expect profit solely from the efforts of the promoter or a third party....

*Id.* at 298–99, 66 S.Ct. at 1102–03, 90 L.Ed. at 1249. The third part of this test, the only point at issue in this case, was expanded upon by the Ninth Circuit in *Securities & Exchange Commission v. Glen W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The court stated that the crucial question was:

> [W]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

*Id.* at 482. The *Howey* test, as refined by *Glen Turner* has been adopted in Alaska. *See Hentzner v. State,* 613 P.2d 821, 823 (Alaska 1980); *Wheeler v. State,* 659 P.2d 1241, 1247 (Alaska App.1983). The question presented in this case is whether the Director's decision that this test was satisfied is supported by substantial evidence. *See Keiner v. City of Anchorage,* 378 P.2d 406, 411 (Alaska 1963).

▬ In determining whether the promoters' efforts were the significant managerial efforts which affected the failure or success of the enterprise, substance and economic reality prevail over form. *See Securities & Exchange Commission v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88, 94 (1943); *Nash and Associates, Inc. v. Lum's of Ohio, Inc.,* 484 F.2d 392, 394 (6th Cir.

1973). Emphasis is not placed on whether it was theoretically possible for a person to refuse the promoters' assistance, but rather whether the typical investor would accept the promoters' control. *Securities & Exchange Commission v. Aqua-Sonic Products Corp.,* 687 F.2d 577, 582–83 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). In making this determination we focus on the promotional emphasis.

> Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements are to be considered in testing the nature of their product.

*Securities & Exchange Commission v. International Mining Exchange, Inc.,* 515 F.Supp. 1062, 1068 (D.Colo.1981).

▬ Based on the totality of the promoters' sales materials and statements, the territorial distributorship program appears to be aimed at investors who will want the promoters to provide substantial managerial assistance.[6] While the Territorial Distributorship Agreement may state that the distributors have experience and expect to profit solely from their own efforts, the full panoply of services offered by the promoters and their promotional statements indicate an intent to focus on investors seeking a passive role.[7]

A distributorship program held to be a security in *Securities & Exchange Com-*

---

**6.** The New Mexico Chief of the Securities Bureau has determined that this territorial distributorship program constituted the offer and sale of unregistered securities and has issued a permanent cease and desist order. This order stated in part that:

> Based on the economic realities of the transactions, including the multiple tax shelter provided by the arrangement being offered and the type of investors thus contacted and attracted to such investments, the majority of whom would normally not be interested in contributing much personal time and effort to the enterprise, but who would be more interested in taking advantage of the entrepreneurial and managerial efforts available through

the marketing services of the affiliated Gem-Mart Consultants, Inc. the finding and conclusion that the distributorships being offered are investment contracts is inescapable.

**7.** The promoters argue that the tax benefits of their program should not be considered in determining whether the territorial distributorships are securities. We believe that the efforts of the promoters in guarantying the tax benefits may properly be considered. The tax benefits of the present program are important as evidence of the type of inducement used by the promoters and the type of investor likely to purchase the program based upon such promotion. The promotional campaign is designed not to attract the average person interested in

*mission v. Aqua-Sonic Products Corp.,* 687 F.2d 577 (2d Cir.1982) is analogous to the territorial distributorship program in the present case. *Aqua-Sonic* involved a plan to distribute dental devices to the public. The promoters sold "licenses" for the right to market these devices in specific geographic regions. The license agreement required the licensee to vigorously promote distribution and sale of the products and to employ such persons as the licensee "in his sole discretion" deemed necessary. *Id.* at 579. Furthermore, the licensee had ultimate control over pricing, and each licensee was told that there would be substantial tax advantages. *Id.* Also, a sales agency agreement was optional for all licensees. A tax opinion letter informed investors that they would receive greater tax benefits if they entered into this agency agreement. *Id.* at 580.

The court in *Aqua-Sonic* ruled that while the sales agency agreement was optional, a typical investor would accept such an option. In deciding that the licenses were investment contracts, the court also relied on the fact that the typical investor had no prior experience in distribution or sale of dental supplies. *Id.* at 583–84. In the present case, as was admitted by one of the promoters, the typical territorial distributor lacked knowledge on how to market the product. In both cases, the promoters sought to attract passive investors, the persons whom the securities laws are designed to protect.

In conclusion, we find substantial evidence to support the Director's decision that the territorial distributorships constituted an investment contract, and hence were securities subject to registration under AS 45.55.070. The Director's cease and desist order is AFFIRMED.

operating his own small business, but rather to attract the wealthy investor seeking a way to save on taxes.