CAUCUS DISTRIBUTORS, INC., Mark Calney, William Leonard Jennings, III, Toni Jennings, Appellants,

v.

STATE of Alaska, DEPARTMENT OF COMMERCE AND ECONOMIC DEVELOPMENT, DIVISION OF BANKING, SECURITIES AND CORPORATIONS, Appellee.

No. S–3243.

Supreme Court of Alaska.

June 15, 1990.

---

Patrick J. Moran, Moran & Bladen, P.C., Houston, Tex., and Bruce E. Davison, Davison & Davison, Inc., Anchorage, for appellants.

Jeffrey W. Bush, Asst. Atty. Gen., and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This is an appeal from the superior court's affirmance of a cease and desist order entered by the Division of Securities against Caucus Distributors, Inc. (Caucus). It requires an interpretation of Alaska's "Blue Sky" laws, AS 45.55.010–.270; specifically, under what circumstances are notes within the statutory definition of covered "securities."

Caucus is self-described as being "engaged in distributing publications of a so-

cial, economic and political nature," notably the works of Lyndon LaRouche. The state Division of Securities found the material facts to be as follows:

Caucus is incorporated as a not-for-profit corporation in New York. Caucus is not registered with the Division of Securities pursuant to the Alaska Securities Act, nor are any of its agents. Also it is not registered to transact business in Alaska. William Leonard Jennings, III, and Toni Jennings are employed by Caucus as fundraisers. Mark Calney is the Northwest regional coordinator for Caucus.

Caucus raises funds from three sources: sales of publications, contributions and loans. It is two loans by Alaska residents, Joseph Drew and Leonard Thompson, to Caucus that are at issue here. Caucus employees negotiated the terms of these loans, which were written on forms prepared by Caucus, and headed "Obligation No." The obligation numbers were usually filled in, but this was described by Caucus employees as being for "no reason at all." Caucus' plan was to repay borrowed sums through its sales of publications and contributions. However, loan repayment came only if authorized from the national office.

While it was normal for Caucus fundraisers to inquire about the financial situation of those being solicited for loans, Caucus did not advise lenders that a loan to Caucus might not be in their best financial interest. The hearing officer found that

nothing describing [Caucus'] ability to repay the loans was provided to a prospective lender either before or after the loan was made, to the best of [Calney's] knowledge. Nothing addressing or describing [Caucus'] ability to repay loans was available to [Calney]. Moreover, lenders were not informed of any delinquency problems which may have been in place at any particular time.

However, Calney and Toni Jennings were aware of "numerous delinquencies," and "it is clear that the lenders were led to believe that they *would* be repaid." (Emphasis in original). Neither Drew nor Thompson received a prospectus, financial statement, or any other "meaningful finan-cial information" from Caucus regarding its ability to repay.

## A. DREW.

Joseph Drew is a 78–year old widower. His sole sources of income are social security, state longevity bonus and his permanent fund dividend. Drew was approached by Caucus representatives in the Seattle airport. At this time, he joined the organization in exchange for $75. After Drew returned home, Toni Jennings began calling him, asking him to lend money to Caucus. Jennings proposed a five-year loan at 10% annual interest. Jennings told Drew that "[Caucus] would pay him sufficient interest on the promissory notes for him to support himself." Drew lent Caucus a total of $45,000, his "life savings." He received two non-negotiable, unsecured promissory notes, one for $40,000 and one for $5,000. Both bore interest at 10%, with interest payable quarterly, and were for a five-year term. The $5,000 note was payable on demand within seven days in the event of an emergency. Drew subsequently demanded emergency payment on this note, but did not receive it. Drew testified that he would not have lent the money to Caucus without the notes and the interest, as well as the belief that he would be repaid. He believed he was making an investment. While the hearing officer noted that Drew was confused at times, he was clear in his testimony that he thought he was investing his "nest egg." Moreover, Toni Jennings "assured [Drew] several times that their outfit was much more safer than the bank was because the banks in the United States are all going broke," and that he would get more interest than he would from a bank. Drew received no prospectus or financial statement from Caucus, suggesting its ability or inability to repay.

## B. THOMPSON.

Leonard Thompson is a 61–year old widower who had lived alone for three years at the time of his contact with Caucus. He too was approached in the Seattle airport by Caucus representatives. After re-

turning home to Alaska, he too began receiving phone calls from Toni Jennings. Again, Jennings requested that Thompson lend money to Caucus through the purchase of promissory notes at 10% interest. Because this rate of interest was higher than what he had been receiving at the bank on investments, he decided to "invest" in Caucus. Thompson lent $2,000 in exchange for an unsecured promissory note from the Seattle Labor Committee, an organization sharing the same address as Caucus and headed by Calney. Thompson also made a contribution of $500 to Caucus via his VISA card. Caucus later made an additional, unauthorized $500 charge against Thompson's VISA.

> The hearing officer found that
>
> Mr. Drew and Mr. Thompson made their loans to [Caucus], in part because of their sympathy with and support of the goals and aims of [Caucus], in part because they believed they were making sound investments, in part because they appreciated the attention they were receiving from [Caucus] distributors, and possibly in part for other reasons.

Based on the foregoing evidence, the hearing officer concluded that the promissory notes executed by Thompson and Drew were "securities" within the meaning of AS 45.55.130(12). He also concluded that by misrepresenting and failing to disclose material facts to Drew and Thompson, Caucus violated AS 45.55.010:[1]

For example, neither Mr. Drew nor Mr. Thompson had specific information about [Caucus'] management, its sources of revenues, or its current financial position; information which is obviously material to an investment decision. [Caucus] failed to inform either Mr. Drew or Mr. Thompson of [Caucus'] problems in the past with repayments, and the possibility or even probability that neither interest nor principal on the notes would ever be forthcoming. Furthermore, Mrs. Jennings and Mr. Calney told Mr. Drew, in order to encourage him to invest, that his $5,000 note would be repaid within seven days in the event of an emergency, although they knew it was unlikely that any such repayment would be forthcoming upon request.

Finally, there is the unauthorized charge on Mr. Thompson's VISA card.... This act constituted fraud in the classic sense, and I find this transaction was sufficiently connected to the sale of securities to Mr. Thompson to constitute a probable violation of AS 45.-55.010(3).

The hearing officer found unreviewable Caucus' claim that the securities were exempt from registration under AS 45.55.-140(a)(11),[2] because 3 AAC 08.910(1)[3] requires those claiming exemptions to file a notice with the Division and provide documents supporting a claim of exemption,

---

1. AS 45.55.010 provides:
 > It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly, to
 > (1) employ a device, scheme, or artifice to defraud;
 > (2) make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 > (3) engage in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

2. AS 45.55.140 provides in pertinent part:
 > (a) The following securities are exempted from AS 45.55.070:
 > ....
 > (11) a security issued by a person organized and operated not for private profit but exclusively for religious, educational, benevolent,

charitable, fraternal, social, athletic, or reformatory purpose, or as a chamber of commerce or trade or professional association.

3. 3 AAC 08.910 provides:
 > The following governs exemptions under the Act relating to securities and transactions:
 > (1) not-for-private-profit issuers shall file a notice with the administrator at least 15 days before making any offers or sales of securities; the notice must contain a ruling or determination by the U.S. Internal Revenue Service recognizing the issuer's exempt status under section 501(c)(3) or 501(e) of the Internal Revenue Code of 1954 (26 USC 501) or other documentation the administrator may require including, but not limited to, proposed offering circular, certified financial statement, by-laws and articles of incorporation, plan of financing, plan of operation, use of proceeds, background of officers and directors (or principals if unincorporated); ....

which Caucus had never done. Finally, the hearing officer stated that the notes at issue had never been registered and therefore Caucus had also sold unexempted and unregistered securities in violation of AS 45.55.030 and AS 45.55.070.

The Division ordered Caucus to cease and desist from "engaging in the offer and sale of unregistered securities ... [and] engaging in the activities of an agent in this state...." Caucus was also ordered to cease and desist from

> employing any device, scheme or artifice to defraud, making any untrue statements of material facts or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engaging in any [a]ct, practice or course of business which would operate as a fraud or deceit upon a person.

The superior court, sitting as an intermediate appellate tribunal, AS 22.10.020; Appellate Rule 601, affirmed.

## II. DISCUSSION

### A. THE NOTES GIVEN TO DREW AND THOMPSON BY CAUCUS ARE "SECURITIES" WITHIN THE MEANING OF AS 45.55.130(12).

■ Caucus argues that it did not violate Alaska securities law because the notes in question are not "securities" within the meaning of AS 45.55.130(12), which defines a "security" as follows:

> In this chapter unless the context otherwise requires:
>
> (12) "security" means a note; ... evidence of indebtedness; ... investment of money or money's worth including goods furnished or services performed in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the instrument or policy decision of the venture; or, in general, any interest or instrument commonly known as a "security"....

We have been faced with the question of what is a "security" within the meaning of

this statute on two prior occasions; the court of appeals has dealt with the question once. *American Gold & Diamond Corp. v. Kirkpatrick*, 678 P.2d 1343, 1345–47 (Alaska 1984) ("investment contract"); *Hentzner v. State*, 613 P.2d 821, 823–24 (Alaska 1980) ("investment contract"); *Wheeler v. State*, 659 P.2d 1241, 1246–49 (Alaska App.1983) ("investment contract").

### 1. *Standard of Review.*

■ The "substantial basis" test is used in reviewing determinations by the Division of Securities as to whether a certain transaction is a "security." *American Gold & Diamond*, 678 P.2d at 1346. Under this standard, we "merely seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

### 2. *Did the Hearing Officer's Decision Have a Reasonable Basis in the Law?*

"The primary purpose [of Alaska's Blue Sky law] is to protect the unwary and unsophisticated members of the general public from deceit and fraud in securities transactions." *Pratt v. Kirkpatrick*, 718 P.2d 962, 969 (Alaska 1986).

■ In both *Hentzner* and *American Gold & Diamond*, we applied federal cases interpreting the Securities Act of 1933, reasoning that, given the analogous definitions of "securities" under state and federal statutes, federal case law provides a reasonable basis to conclude that an offering is a security within AS 45.55.130(12). *Hentzner*, 613 P.2d at 823 & n. 4; *American Gold & Diamond*, 678 P.2d at 1345–47 & n. 5; 15 U.S.C. § 77b(1) (1981). Thus, if these notes would be securities under federal law, then the hearing officer had a reasonable basis for finding them to be securities under state law.

In the recently decided case of *Reves v. Ernst & Young*, —— U.S. ——, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the Supreme

Court resolved a long standing debate among the circuits as to how the Federal Securities Act should be applied to notes. All nine justices agreed that the "literal" or "family resemblance" test of the Second Circuit was the most apt. *See id.* at —— & ——, 110 S.Ct. at 950 & 956 (Rehnquist, C.J., concurring in part and dissenting in part). *See generally Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1137 (2nd Cir.1976) (Friendly, J.), *modified,* 726 F.2d 930 (2nd Cir. 1984).

The Court in *Reves* limited the application of the investment contract test of *SEC v. W.J. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) to investment contracts. The Court reasoned that just because a note is not also an "investment contract" does not necessarily take it out of the statute, which on its face applies to "notes." *Reves,* —— U.S. at ——, 110 S.Ct. at 950 ("To hold that a 'note' is not a 'security' unless it meets a test designed for an entirely different variety of instrument 'would make the Acts' enumeration of many types of instruments superfluous, '... and would be inconsistent with Congress' intent to regulate the entire body of instruments sold as investments.") (citations omitted).

 In *American Gold & Diamond,* we adopted the *Howey* investment contract test to analyze the investment contract at issue. *American Gold & Diamond,* 678 P.2d at 1345–46. *American Gold & Diamond* did not involve a note. *Id.* at 1345. *Howey* is still good law after *Reves* as to investment contracts; some, but not all, notes also meet the *Howey* test for investment contracts. *Reves,* —— U.S. at ——, 110 S.Ct. at 950. Nevertheless, both notes *and* investment contracts fall within the statutory definition of "security." [4]

The *Reves* test for notes begins with the plain language of the statute, which on its face applies to "notes," unless the context otherwise requires. *Id.* The burden is on the defendant to prove that a note is not a security because the "context otherwise requires." *Id.*

 Not all notes are "securities." The purpose of the federal securities acts is to regulate the field of investment; the definition of "security" should be interpreted sufficiently broadly to encompass any instrument that might be sold as an investment. *Id.* at ——, 110 S.Ct. at 948. In an effort to give substance to the "investment/non-investment" dividing line, the *Reves* Court, drawing on *Touche Ross,* 544 F.2d at 1138, set forth a broad, non-exclusive laundry list of contexts in which notes are not securities:

> ... the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).

*Reves,* —— U.S. at ——, 110 S.Ct. at 950, *quoting Touche Ross,* 544 F.2d at 1138. *See also Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2nd Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (adding to the laundry list a commercial bank loan to finance current operations of a borrower's business); *Equitable Life Assur. Soc'y of the United States v. Arthur Andersen & Co.,* 655 F.Supp. 1225, 1235–44 (S.D.N.Y.1987) (un-

---

4. The notes at issue here are probably also "investment contracts" under *American Gold & Diamond. Cf. Caucus Distributors, Inc. v. Comm'r of Commerce,* 422 N.W.2d 264, 271 (Minn.App.), *rev. denied, cert. denied,* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1988) (*Minnesota case*). However, the hearing officer did not make his decision on this ground and thus we have no occasion to resolve this question. We do stress, however, that our decision today casts no shad-

ow on *American Gold & Diamond.* A hearing officer could reasonably find that instruments which qualify as "investment contracts" under *American Gold & Diamond and* instruments which qualify as "notes" under this decision are securities within the meaning of AS 45.55.-130(12). Our review is limited to the question of whether the hearing officer's decision had a reasonable basis in law.

subordinated loan from insurance company made in the regular course of its business, limiting the borrower's ability to incur further debt); *Boeck v. Logan 480 Dairy Farm*, 606 F.Supp. 868, 871 (S.D.Iowa 1985) (purchase money security note on a dairy farm).

■ If a note is not on the list, or does not bear a "strong family resemblance" to something on this list, then it is a security under federal law. *Reves*, —— U.S. at ——, 110 S.Ct. at 950; *Touche Ross*, 544 F.2d at 1138. The *Reves* Court then announced four factors shared by the items on the list, to help guide future additions to it:

First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." Second, we examine the "plan of distribution" of the instrument, to determine whether it is an instrument in which there is "common trading for speculation or investment." Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Reves*, —— U.S. at —— ——, 110 S.Ct. at 951–52 (citations omitted).

The hearing officer below applied the Second Circuit test adopted in *Reves*, and concluded that the notes at issue were securities, because they bore no "family resemblance" at all to the commercial transactions of the *Touche Ross* list:

The promissory notes issued to Messrs. Drew and Thompson are not of the type described by the Second Circuit and bear not even the faintest resemblance to them. These notes were not delivered in consumer financing or secured in any way, do not formalize an institutional loan to a home buyer, and do not resemble cash-flow financing by a business or anything similar. Messrs. Drew and Thompson apparently regarded the loans as profit-making investments.

Furthermore, this is the kind of transaction in which the additional protection available under the securities laws is needed. [Messrs.] Drew and Thompson were relatively unsophisticated investors who incurred significant risk without the practical ability to obtain and evaluate necessary information before taking that risk. In fact, there was a very high risk of non-repayment, but not only was this fact not made clear, it was not mentioned. Moreover, this transaction was part of a broader pattern of similar transactions, nationwide in scope, involving large numbers of transactions, large amounts of money and focusing on vulnerable people.

The offer and sale of notes to Messrs. Drew and Thompson thus did not take place in a context that requires the notes to be treated as other than securities. Far from finding no compelling reasons for disregarding the plain language of the statute, I find compelling reasons for adhering to it. Application of the Second Circuit's "literal" test to this case thus dictates the conclusion that the notes are securities within the meaning of AS 45.-55.130.

We agree. The notes in this case bear no resemblance at all to any of the routine commercial financing arrangements excluded from coverage by *Reves* and *Touche Ross* nor has Caucus shown any reason to

exclude these notes from coverage. The notes were sold in order to finance Caucus' fund-raising activity, and Drew and Thompson were both led to believe that they would be repaid. This cuts in favor of finding the notes to be securities. *Reves,* — U.S. at ——, 110 S.Ct. at 950. Emphasized in *Reves* was that the notes there, like the notes here, were specifically offered at an interest rate higher than Drew and Thompson were earning on their investments. *Id.* at ——, 110 S.Ct. at 952. Moreover, as in *Reves,* the plan of distribution here was coordinated and national in scope. *Id.* Drew and Thompson were not the only targets of Caucus: ten others have made similar loans in Alaska, and similar cease and desist orders have been issued in Minnesota, Indiana, and Washington, with similar proceedings having begun in Maryland and Illinois. Drew and Thompson were led to believe and did believe that they would earn a profit; the "public's reasonable perceptions" of notes as investments militate in favor of a finding of security. *See id.* Finally, the notes here were not collateralized or insured; thus, just as in *Reves,* there was no risk-reducing factor cutting against a finding of security. *Id.*

Given the foregoing, and that this scheme was found to be fraudulent and thus squarely within the purpose of the Blue Sky Act, the Division had at least a reasonable basis in law for finding the notes to be "securities." We affirm this determination.

Caucus argues that a note cannot be a security because securities entail "profits" and fixed rates of return are not "profits." We reject this proposition.

Defendants maintain that a stated rate of interest cannot be a "profit".... [I]f "interest" is not a "profit" within the meaning of securities, then no note, bond, or debenture can ever be regulated by such statutes. This would mean that the greater part of all investment capital would be exempt from any kind of regulation because promoters would label the benefits from their activities as "interest." It would be odd indeed that a promoter would be liable for making

"double your money" pie-in-the-sky promises of "profits" and "dividends," but could entirely escape accountability for equally outrageous claims that savers can earn 100% "interest" on their "accounts." Each promise is illusory; each scheme is identical save for labels; each solicitation is equally fraught with peril for the unwary investor.

If it be objected to that the court is indulging in *reductio ad absurdum* argument, and that no one has ever offered such rates for "notes," it bears reminding that on August 9, 1920 when federal authorities closed the Ponzi operation for mail fraud, a rival concern called the Old Colony Foreign Exchange Co. promised disappointed Ponzi investors 100% interest on six month notes. *N.Y. Times,* Aug. 10, 1920, at 8. Two days previously, the Massachusetts Attorney General lamented that the Commonwealth had no state law authorizing him to suspend or control Ponzi's affairs. *N.Y. Times,* Aug. 8, 1920, at 23. Massachusetts passed its Blue Sky law shortly after, on May 27, 1921. Acts 1921, chap. 499. Its definition of security included any "note."

*Robertson v. White,* 635 F.Supp. 851, 859–60 & n. 2 (W.D.Ark.1986), *rev'd sub nom. Arthur Young & Co. v. Reves,* 856 F.2d 52 (8th Cir.1988), *rev'd sub nom. Reves v. Ernst & Young,* — U.S. ——, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990); *see also Reves,* — U.S. at —— n. 4, 110 S.Ct. at 952 n. 4.

3. *Was the Hearing Officer's Decision Supported by Substantial Evidence?*

■ Caucus also briefly challenges certain factual findings made by the hearing officer. Our review of the record reveals that there is abundant and substantial evidence in the record supporting these factual findings. *Cf. Hagel v. King Steel, Inc.,* 785 P.2d 1207 (Alaska 1990) (per curiam) (agency findings of fact reversed only if not supported by "substantial evidence in light of the whole record.") (citation omitted).

## B. CAUCUS' FIRST AMENDMENT ARGUMENTS LACK MERIT.

■ Caucus argues that because it is a political organization, raising money to further its political purposes, the application of Alaska's Blue Sky laws to its "fundraising" efforts violates the First Amendment.[5] There are two aspects to Caucus' argument: 1) that its political purpose excuses any fraudulent practices, and 2) that the registration/disclosure requirements imposed by Alaska's Blue Sky law on even non-fraudulent political fundraising by way of loans unduly burdens Caucus' political activities.

■ The first aspect of Caucus' argument is meritless. A state has a compelling interest in protecting the public from fraudulent practices, even where the purpose underlying those fraudulent practices is protected by the First Amendment. *Minnesota case*, 422 N.W.2d at 273; *see also Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940). *Cf. Pratt*, 718 P.2d at 969 (protecting the general public from deceit and fraud in securities transactions is a compelling interest). A political purpose is not a license to commit fraud.

■ We also reject the second aspect of Caucus' argument. Under the terms of the Division's cease and desist order, Caucus could still engage in political fundraising through borrowing, without using fraudulent means, by either registering its securities or by obtaining an exemption under AS 45.55.140(a)(11) (exempting securities issued by a person organized and "operated not for private profit but exclusively for religious, educational, benevolent, charitable, fraternal, social, athletic, or reformatory purposes....") To obtain an exemption, Caucus would need to comply with 3 AAC 08.910(1). This regulation requires the filing of a notice with the Division at least 15 days before an offering. The notice must contain an IRS ruling or determination of tax exempt status "or other documentation the administrator may require including, but not limited to, proposed offering circular, certified financial statement, bylaws and articles of incorporation, plan of financing, plan of operation, use of proceeds, background of officers and directors (or principals if unincorporated)." 3 AAC 08.910(1). A $25 filing fee is also required. 3 AAC 08.910(6).

■ In *Buckley v. Valeo*, 424 U.S. 1, 60–84 & n. 76, 96 S.Ct. 612, 654–66 & n. 76, 46 L.Ed.2d 659 (1976) (per curiam), the Court noted that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64, 96 S.Ct. at 656. *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–66, 78 S.Ct. 1163, 1170–74, 2 L.Ed.2d 1488 (1958). Such disclosure requirements, if significant enough to burden First Amendment activity as a practical matter, must be justified by a compelling interest and there must be a substantial relation between the governmental interest and the information required to be disclosed. *Buckley*, 424 U.S. at 64–65, 96 S.Ct. at 656–57; *NAACP*, 357 U.S. at 460–62, 78 S.Ct. at 1170–72. Such scrutiny is invoked where the disclosure requirements would entail divulging the names of contributors. *Buckley*, 424 U.S. at 65–66, 96 S.Ct. at 656–57; *NAACP*, 357 U.S. at 463–65, 78 S.Ct. at 1172–73.

■ In *Riley v. National Fed'n of the Blind of North Carolina*, 487 U.S. 781, 108 S.Ct. 2667, 2676–80, 101 L.Ed.2d 669 (1988), the Supreme Court held that a North Carolina statute requiring charitable solicitors to disclose to contributors what percentage of their contributions actually went toward charitable activities violated the First Amendment. Solicitation of money for charitable purposes is protected speech invoking strict scrutiny, "where, as here, the component parts of a single speech are inextricably intertwined...." *Id.* 108 S.Ct. at 2677. In performing strict scrutiny analysis,[6] the Court accepted the

---

5. "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I.

6. We separately conclude that the solicitation of funds for political purposes is strict scrutiny speech protected by Article I, § 5 of the Alaska Constitution.

validity of North Carolina's asserted fraud-deterrence purpose, but held that forcing disclosure of what percentage of solicited funds were spent on a particular purpose was insufficiently tailored to pass constitutional muster. *Id.* 108 S.Ct. at 2678–79. The Court noted, however, that:

> [I]n contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged donor misperception, more benign and narrowly tailored options are available. For example, as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation. Alternatively, the State may vigorously enforce its anti-fraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements. These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored.

*Id.* 108 S.Ct. at 2679.[7]

The fact that under this cease and desist order, Caucus will have to register future borrowing from supporters, even assuming a lack of deceit, does not impermissibly impinge on its First Amendment activities. Nothing in 3 AAC 08.920(6) requires the divulgence of who its contributors are; all that is required is the divulgence of who the borrowers are and proof of how the debts are to be repaid. *Compare NAACP,* 357 U.S. at 463–64, 78 S.Ct. at 1172–73; *Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) ("[w]ithout doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent.") (footnote omitted).

■■■ The disclosure required to obtain an exemption passes constitutional muster under *Riley.* The deterrence of fraud is a compelling state interest. *Pratt,* 718 P.2d at 969. Moreover, the disclosure provisions of 3 AAC 08.910(1) are the same as those approved of as sufficiently narrowly tailored by the Court in *Riley. Riley,* 108 S.Ct. at 2679 (implying that the state may require fundraisers to disclose detailed financial information before entering the forum and the state may vigorously enforce its anti-fraud laws). *See also Cantwell,* 310 U.S. at 306, 60 S.Ct. at 904. The information required to be disclosed to obtain an exemption under 3 AAC 08.920(6) does not include the names of who potential contributors/lenders are, only who the borrowers are and how they intend to and will be able to pay back sums borrowed. This information is of obvious relevance to the goal of preventing fraud.

AFFIRMED.[8]

---

**7.** The two dissenters in *Riley* reasoned that the solicitation of money by professionals is not something within the reach of the First Amendment. *Id.* 108 S.Ct. at 2683 (Rehnquist, C.J., dissenting).

Both the majority and the dissent in *Riley* seem to briefly distinguish securities transactions, suggesting that strict scrutiny might not apply and that this would constitute "[p]urely commercial speech." *Id.* 108 S.Ct. at 2677 n. 9 & 2683.

**8.** Nor does the fact that under 3 AAC 08.910(1), Caucus would have to apply for an exemption 15 days in advance of an offering create an impermissible prior restraint problem. *Riley,* 108 S.Ct. at 2680 (advance license provisions are valid if they provide that the licensor "will, within a specific brief period, either issue a license or go to court.")